[No. 1695.]

## THE STATE OF NEVADA, RESPONDENT, v. JOHNNY, AN INDIAN, AND JOE IBAPAH, AN INDIAN, APPELLANTS.

1. JURY—SELECTING JURY—IRREGULARITIES. Though the clerk of the board of county commissioners cannot legally select, nor urge the selection of, any juror, the board, in selecting jurors for attendance on the district court, may take advantage of information in the possession of the clerk, so long as it exercises its own judgment in conformity with the statute.

2. CRIMINAL LAW—SELECTION OF JURY—HARMLESS ERROR. In a criminal case, it was alleged that the county clerk was present when the board selected jurors for attendance on the district court and recommended a large number of electors to be selected as jurors. It was not shown that any of the persons whom the clerk recommended were among the twelve who tried accused, or were on the panel drawn from the box and in attendance on the court at the time of the trial. It was not claimed that the accused did not have an impartial jury. *Held*, that the irregularity, if any, arising from the conduct of the clerk, was not prejudicial to accused.

3. HOMICIDE—INDICTMENT—SUFFICIENCY. Under Comp. Laws, 4208, providing that an indictment shall be sufficient where the act charged is set forth in ordinary and concise language so as to enable a person of common and ordinary understanding to know what is intended, etc., an indictment charging that accused feloniously and of malice aforethought killed a human being by striking, cutting, and stabbing, by means of which he died, being in substantial conformity to the form prescribed by section 4200, is not open to the objections that it does not charge accused with murder, or aver that the acts were done with intent to kill.

4. CRIMINAL LAW—TRIAL—SEPARATE TRIAL OF DEFENDANTS—TIME TO DEMAND SEPARATE TRIAL OF DEFENDANTS. Comp. Laws, 4325–4327 (Cr. Prac. Act, 360–362), provide that where two or more defendants are jointly indicted, they shall be jointly tried, unless for good cause shown the court shall otherwise direct, and the court may at any time before defendant has gone into his defense, on the application of the district attorney, direct any defendant to be discharged from the indictment, etc. Two persons jointly indicted were jointly tried. After the state had rested defendant J. rested, and moved that the case be given to the jury at that time, before any testimony was offered on behalf of

Points decided.

his codefendant. *Held*, that the motion was properly denied, for, if granted, it would have given the defendant a separate trial, which could only be granted on application made before the commencement of the formation of the jury.

5.  SAME—HARMLESS ERROR—ERRONEOUS ADMISSION OF CONFESSION. A defendant cannot be prejudiced by the admission of his confession which he voluntarily acknowledges under oath is true.

6.  SAME—CONFESSIONS—ADMISSIBILITY. That one was imbued with fear, occasioned by his arrest for crime, and a knowledge of his guilt thereof, does not alone make his confession inadmissible.

7.  SAME—ERRONEOUS ADMISSION OF EVIDENCE—HARMLESS ERROR. Where, on a trial for homicide, defendant admitted the killing, and sought to avoid a conviction by showing that he was drunk at the time, the admission of evidence that defendant when intoxicated was transformed into a dangerous character was not prejudicial to him.

8.  ERROR IN ADMITTING IMPROPER EVIDENCE. The error in admitting improper evidence in a criminal case to establish a fact testified to by other witnesses, including accused, when testifying as a witness in his own behalf, is harmless.

9.  HOMICIDE—INSTRUCTIONS—INTOXICATION. On a trial for murder in the first degree instructions that drunkenness can only be considered for the purpose of determining the degree of the crime, and for this purpose must be received with great caution; that presumptively every killing is murder; that in cases of premeditated murder the fact of drunkenness is immaterial; that the jury must discriminate between the condition of mind merely excited by intoxicating drink, and yet capable of forming a deliberate intent to take life, and such a prostration of the faculties as renders a man incapable of forming the intent; that the evidence must convince the jury that the deliberate premeditated design to murder was intentionally formed; that, in considering whether such a design was formed, the jury must consider the evidence of drunkenness, and, if accused was too much intoxicated to form such a deliberate and premeditated purpose, he cannot be found guilty of murder in the first degree, etc., correctly state the law on the defense of drunkenness.

10.  CRIMINAL LAW—INSTRUCTIONS—APPLICABILITY TO CASE. The refusal to charge on the law of manslaughter on a trial for homicide is not error, in the absence of evidence tending to reduce the killing to manslaughter.

11.  REFUSAL TO GIVE INSTRUCTIONS EMBODIED IN THOSE GIVEN. It is not error to refuse to give instructions embodied in those given.

12.  SAME—CREDIBILITY OF TESTIMONY OF ACCUSED—INSTRUCTIONS. Where the court charged that the jury must consider all the evidence, an instruction that the evidence of accused, if convincing, could be acted on, otherwise rejected, was not erroneous, as leading the jury to fail to give due consideration to the testimony of the accused.

13.  INDIANS—CRIMES BY INDIANS. Under Comp. Laws, 4655, providing that the laws concerning crimes and punishments and the laws concerning proceedings in criminal cases shall extend to the Indians in the state, etc., an Indian on trial for crime is subject to the same laws as govern in the case of a white man.

APPEAL from the District Court of the Fourth Judicial District of the State of Nevada, Elko County; *George S. Brown*, Judge.

Johnny, an Indian, and Joe Ibapah, an Indian, were convicted of murder in the first degree, from which they appeal. **Affirmed.**

The facts sufficiently appear in the opinion.

*F. S. Gedney*, for Appellant Johnny:

I. The court erred in denying defendant's challenge to the panel of the jury. Our statute provides that the board of county commissioners shall select the trial jurors that shall be required for attendance on the district court. (Comp. Laws, 3875.) A party entitled to an action, if he is entitled to a right of trial by jury, is also entitled, at the commencement of the trial, to a panel drawn in substantial conformity with the requirements of the statute. (*State* v. *Landry*, 74 Pac. 418; *State* v. *Tighe*, 71 Pac. 3.)

II. A departure from the forms prescribed with respect to the drawing and return of the jury, such as may deprive a defendant of an opportunity to secure a competent and impartial jury, is ground for a challenge to a panel. (*People* v. *Davis*, 15 Pac. 8; *State* v. *Austin*, 183 Mo. 476; *State* v. *McNamara*, 3 Nev. 70; *People* v. *Coffman*, 24 Cal. 234.)

III. The indictment in this case is defective, and the court should have sustained the defendant's objection to the same. It is defective in that it does not in the body thereof charge the defendants of the crime of murder or state that murder was committed.

IV. The court should have granted the motion of the defendant Johnny, and allowed the jury to pass upon his guilt or innocence, before Ibapah's defense was put in. It is the privilege of a defendant jointly tried with another, when there is little or no more evidence against him and he is willing to be tried on the evidence of the prosecution, to demand that the jury pass upon his case before the other defendant opens his defense, and the jury should be charged by the court, and consider their verdict as if the case had no connection with any other. (*Vybee* v. *State*, 36 Tex. 366.)

V.   One codefendant's case should be given to the jury when the other defendant requests it, so that the codefendant may use him as a witness in his behalf.   (*Jones* v. *State*, 62 Am. Dec. 550; *Fitzgerald* v. *State*, 12 Mo. 413.)· If this right is given to a codefendant, it certainly should be extended to the person whose life is in jeopardy, the one who must suffer the consequences of a conviction.

VI.   There is no presumption that a killing is not man-slaughter; the state must prove it is murder; that is, the burden of proving that the killing was done with malice aforethought is upon the state.   Otherwise, the state could prove that a certain person killed another and could there rest and be entitled to a verdict of murder in the second degree, at least.   True, malice may be presumed, but the facts when shown must warrant the presumption, and those facts must be shown.   Express malice must be shown by the external circumstances capable of proof.   (Comp. Laws, 4670–4672.)   Malice is never presumed, but must be proved; it is an essential element of murder, therefore there is no presumption that every, or any, killing is murder.   (21 Am. & Eng. Ency. Law, 2d ed. 139.)

*E. J. L. Taber*, for Appellant Joe Ibapah:

I.   The specific acts alleged are not alleged to have been done with intent to kill.   (Am. & Eng. Ency. Law, vol. 21, pp. 102, 111; 10 Ency. Pl. & Pr. 116, 117.)

II.   The confession made by Joe Ibapah the night of his arrest, while standing outside the jail with an officer and two other men; his confession next morning at the breakfast table; and the one after breakfast, in the jail, in the presence of the newspaper editors and others, should have been excluded. These confessions were not freely and voluntarily made, and more particularly the one made the evening of the arrest, while in the custody of Officer Harbin.   None of these confessions were reliable.   They were extorted by fear.   Ibapah was made to believe that it would be better for him to tell.   He was afraid not to tell something, whether it was the truth or not. There were inducements held out by implication, Ibapah having been advised that he had better tell the whole thing,

as Johnny had already told it all, and had made his con-
fessions in reliance upon such statements; and requests
and admonitions to tell all about it were given in such
language and under such circumstances that the prisoner
must have understood them as recommending a confession
of guilt.   The words spoken to Ibapah were equivalent to:.
"You had better speak the truth.   You had better confess.
You had better tell about it."   Ibapah was in the custody
of the officers when he made these confessions, and the
evidence shows that they were induced by hope and
fear.   The prisoner was certainly influenced to some
extent by hope or fear, and especially by fear.   The con-
fession made by Ibapah the evening of his arrest was
certainly obtained under improper influences, and there was
no evidence obtained to rebut the presumption that this
influence was still exercising itself upon Ibapah's mind the
next morning, when he made confessions of the same nature.
The evidence adduced to rebut this presumption must be strong
and clear in order to render the confession admissible.   The
state did not acquit itself of the burden which rested upon
it to show that these confessions were voluntary.   It seems
clear that the confessions were, and that the first one in
particular was, made involuntarily and under the influence
of fear.   But, even if there was only a reasonable doubt as
to whether the confessions were voluntary or involuntary,
the law is clear that they should have been excluded.   It
should be remembered also that this defendant was an
Indian.   He was not acquainted with criminal procedure.
He did not know but that he might suffer harm then and
there.   It is only natural that he should have been filled with
the greatest fear and that he should have expected that by
telling something, whether true or not, he might ward off
present bodily harm.   These confessions should not have
been admitted under the circumstances, even in the case of a
white man, much less in the case of an ignorant Indian, in
the custody of the officers and surrounded by white men, not
knowing what might happen to him next.   It cannot be said
that these confessions were prompted by a desire on the part
of the accused to relieve his conscience or to state the truth.

The law looks with great suspicion on confessions made to officers. The actions of those in control of Ibapah were equivalent to threats. The evidence clearly shows that a trap had been laid for the prisoner.

III.   The law is well settled that if the court sees fit to refuse defendant's requested instructions and substitute for them its own, it must be careful in so doing to instruct the jury in a manner which will be entirely fair. We submit that in this case the court in its instructions has not given the rights proper consideration in behalf of the defendants, and we fully request the court in considering this matter to bear in mind, among others, the following principles and authorities: Abbott's Trial Brief, Criminal Causes, p. 612, par. 2.

IV.   A party has a right to have his instructions given in his own language, if there are facts in evidence to support them, and they contain a correct statement of the law, and are not vague, ambiguous, or calculated to mislead. (*State* v. *Allen*, 45 W. Va. 65, 30 S. E. 209.) Requested instructions which are pertinent and clear should be given, and others of a more general nature should not be substituted therefor. (*State* v. *McCann*, 16 Wash. 249.)

V.   The presumption of criminal intent, even where it has been shown that the act charged was done with a knowledge of the facts, is not a presumption of law, but is a question for the jury. It is error to instruct them that the law presumes a criminal intent. They may be instructed that from such facts they may infer criminal intent. But where a specific intent is necessary to make the act criminal, the specific intent cannot be inferred from the act. (Abbott's Tr. Br., Crim. Causes, pp. 677, 678.)

VI.   Intoxication may be considered upon the question of mental capacity to exercise a specific intent or deliberation or premeditation necessary to be proved. (See note to *Harris* v. *United States*, 36 L. R. A. 465; *People* v. *Hill*, 123 Cal. 47.)

VII.   The trial court refused to give any instructions pertaining to manslaughter. This was error. There was evidence, though it may have been slight, that the deceased was killed because he refused to give back fifty cents which had

been given him by one of the defendants for the purpose of buying whisky. This was evidence of provocation, even if it was only slight. (11 Ency. Pl. & Pr. 182.)

VIII. The court committed error in both Nos. 13 and 27 of its charges to the jury, in that those parts of the charge fail to state that the jury must find certain things from the evidence. This should at least be stated, even if the court should not take the view that the words "beyond a reasonable doubt" should also be added. (11 Ency. Pl. & Pr. 183.) The first part of No. 27 of the court's charge to the jury was prejudicial repetition. (11 Ency. Pl. & Pr. 189.) As to the trial court's refusal to give most of defendants' requested instructions, see 11 Ency. Pl. & Pr. 213, 214, 215, 253, 298, 299.

*James G. Sweeney*, Attorney-General, and *Otto T. Williams*, District Attorney of Elko County, for Respondent:

I. The trial court did not err in denying defendants' challenge to the jury. It nowhere appears in the empaneling of the venire from which the jury was selected in the present case that any of the substantial rights of the defendants were affected, nor that they suffered any substantial injury. (*Malignon* v. *Territory*, 58 Pac. 505; *Sharp* v. *United States*, 76 Pac. 177; *United States* v. *Collins*, 1 Woods, 499; *State* v. *Squires*, 2 Nev. 226; *Brafford* v. *Commonwealth*, 16 S. W. 710; 12 Ency. Pl. & Pr. 277.) The county commissioners clearly and unmistakably substantially complied with the law in drawing the jury, and the transcript plainly discloses that there was no material or substantial departure from the statutes. (Comp. Laws, 3875, 4288, 4293, 4294; Trans. pp. 297–319.) The testimony taken on the challenge interposed shows beyond a question of a doubt that the board of county commissioners empaneled the jury, and that, if any assistance was rendered them by the county clerk, it was in his ministerial capacity as clerk of said board. We do not deny the doctrine sustained by authorities cited by counsel and innumerable other authorities to the effect that if there is such a substantial departure from the statutes in drawing a panel that defendants were deprived of a fair and impartial jury, a challenge properly

interposed should be sustained. Nor do we take any exception to the doctrine that if a panel is drawn by any one other than those officially authorized and directed to empanel a jury that such a jury will be illegal. It is not necessary to discuss the point further in the present case, however, as the court's findings of fact, as settled and allowed on the bill of exceptions on the testimony adduced at the time the challenge was interposed, is abundantly sustained by the case of *State* v. *Hancock*, 28 Nev. 300.

II.   The indictment is legally sufficient. The intent of a person to commit murder need not be stated in the indictment; the intent resolves itself into a question of fact to be determined from the evidence in each particular case. In setting out a statutory offense it is sufficient to describe it in the words of the statute, with the statement of the acts constituting the offense, in ordinary and concise language and in such a manner as to show that the statutory offense has been done by the party therein named and to inform him as to what has been intended. (Comp. Laws, 4199–4201, 4206–4208; *State* v. *Millain*, 3 Nev. 409; *State* v. *Glovery*, 10 Nev. 24; *State* v. *Huff*, 11 Nev. 17; *State* v. *Raymond*, 11 Nev. 99; *State* v. *Crozier*, 12 Nev. 300; *State* v. *Hing*, 18 Nev. 307; *State* v. *Trolson*, 21 Nev. 419.)

III.   There was no evidence tending to show manslaughter, hence requested instructions were properly refused. (*State* v. *Millain*, 3 Nev. 410; *State* v. *Donovan*, 10 Nev. 36.) No evidence in the record tending to show insanity, hence improper to instruct on that subject. (*State* v. *Hartley*, 22 Nev. 359.) And the instruction on drunkenness presented the law of the case. (*State* v. *Thompson*, 12 Nev. 151; *People* v. *Belencia*, 21 Cal. 544; *People* v. *Williams*, 43 Cal. 345; *People* v. *King*, 27 Cal. 507; *People* v. *Lewis*, 36 Cal. 531; *People* v. *Ferris*, 55 Cal. 592; *People* v. *Vincent*, 95 Cal. 428; *People* v. *Hawkins*, 63 Pac. 258.) Judgment not to be reversed because of refusal to give instruction requested if those refused were covered and the law of the case laid down properly and fairly by trial judge. (*State* v. *Buralli*, 27 Nev. 54, and cases there cited.)

By the Court, NORCROSS, J.:

The defendants, on the 27th day of December, 1905, killed a human being, designated in the indictment as Fred Foreman, at Montello, in the County of Elko, by cutting and stabbing him with knives. They were thereafter jointly indicted by the grand jury of Elko County for the crime of murder, jointly tried upon such indictment, and both convicted of murder in the first degree. Thereafter, on the 23d day of March, 1906, judgment of death was pronounced upon them. They appeal to this court from the judgment, and from an order denying their motion for a new trial.

Both upon the trial and upon this appeal, the defendants have been each represented by special counsel, and each relies upon one or more assignments of error based upon exceptions in which the other did not join. For this reason, the case must be treated as if there were two separate appeals. Most points, however, are common to both, and will require to be noticed but once. The evidence in this case shows that the man killed by the defendants was one of the world's unfortunates, who was traveling, friendless and alone, across the state. He had but one leg, and walked with a crutch. Upon the night of the murder he was sleeping in an enclosure made of railroad ties, in the center of which was a fire. This inclosure was entered by the defendants, according to their own testimony, some time during the night, probably about midnight. At the trial the defendants made no attempt to disclaim responsibility for the killing, but, upon the contrary, admitted it in their own testimony. The defendant, Ibapah, who is a Goshute Indian, detailed with considerable particularity the manner in which the murder was accomplished. According to his testimony, the defendant, Johnny, and himself had been drinking quite frequently of Jamaica ginger during the day, and had also secured a pint flask of whisky, which they consumed. Some time during the night they observed the light caused by the fire in the tie house. They went to the inclosure and climbed down in it, finding the man, whom they afterwards killed, lying down on some ties. They first sat down upon a tie,

and then asked the man to go and get them some whisky.
Johnny gave him half a dollar, and the man said, "I can't go
up there; I got one leg." What happened next the witness
said he did not remember because he was too drunk. He then
testified that the man put the money in his pocket, and Johnny
asked him to give it back. He did not know whether he gave
the money back, but Johnny said to him, Ibapah, "Let's go
and kill that man. I hold both hands and you cut throat."
Ibapah said, "All right." Johnny then gave Ibapah his
knife, and held the man's hands crossways by the wrists.
Ibapah then went and got the man by his coat. The man
tried to raise up, and Ibapah put his knee on his breast,
holding his knife in his right hand. Johnny then said, "Go
ahead and cut him." He held the coat with his left hand
and with the right hand he put the knife against his throat,
and Johnny says, "Cut him hard." Then he killed him.
After they had killed him Johnny looked in the man's
pockets. Johnny then cut off the man's shoe, saying, "There
is money in shoe sometimes." Then they both said, "Let's
put him on top of fire." Johnny said, "Let's put on lots of
ties and·burn him up." They put the body on the fire, and
put ties on it also. They then left; Ibapah taking with him
the dead man's overcoat, and went to the camp of Johnny's
father. Upon arriving there Johnny asked for something
to eat, and Ibapah told that they had killed a man. The
testimony of Johnny, who is a Shoshone Indian, varies
from that of Ibapah, in that he testified he did not know
much about what happened; that he was too drunk to
remember. He testified that he remembered holding the
murdered man's hands, and helping to place him on
the fire, but further than that he had no recollection of
the occurrence whatever. The condition in which the body
of the deceased was found the morning following the murder
is described by one of the witnesses for the state as follows:
"The throat had been cut from ear to ear. The left eye had
been stabbed out. There was a deep wound in the left cheek.
The right arm had been broken so that the bone protruded
through the clothing. There were bruises on the body. The
clothing had been almost torn off the body. Blood stains

were visible all around, and a pool of blood was in the south corner of the little tie house in which the body lay. The body had been thrown on a coal fire, and was burning at the time. The imprint of a bloody hand, clearly defined, was visible on the ties lying just west of the tie house. Several ties had been thrown into this tie house near the fire, and one or two ties onto the fire. I saw two knives; one lying on the pile of ties where the imprint of the hand was outside, and the other in the tie house between the man's leg and a tie. The man's shoe was near his foot. It had been cut from the top to the sole. There were bloody stains on and in the shoe. The pockets of the coat and trousers had been turned inside out. Part of the clothing was burned, and the pockets had been torn away and thrown into the fire and on the ground in the tie house."

It would seem from the record that there was some manifestation upon the part of each of the defendants to seek to gain some advantage at the expense of the other, although both relied upon drunkenness in mitigation of the offense. According to their testimony, they had consumed during the day several bottles of Jamaica ginger, which contained, according to the testimony, about seventy per cent of alcohol; and a pint flask of whisky. Charles Brown, a witness on behalf of the defendants, testified that he saw them at Montello the afternoon and evening preceding the murder. He saw them first about 2 o'clock, when they seemed to be under the influence of liquor, drunk enough to be boisterous. He saw them again between 4 and 5 o'clock, coming in front of a saloon, and they were talking quite loud, and were drunk. He, in company with a man named Richard Cromley, saw them again that night between 11 and 12 o'clock. They were quite drunk then, trying to help each other along. They were talking very loud and boisterous.

1. Upon the case being called for trial, the defendants jointly interposed a challenge to the panel, upon the ground that there was a material departure from the forms prescribed by the statute in respect to the drawing and the return of the jury. The irregularity complained of is alleged to have consisted in this: That at the meeting of the board of county

commissioners, for the purpose of selecting from the qualified electors the number of trial jurors that would be required for attendance upon the district court until the next annual selection, one A. G. Dawley, county clerk of the County of Elko, was present, and did then and there nominate, suggest, and recommend a large number of electors to be selected as such jurors, to wit, more than twenty, and that the names so selected and nominated by said Dawley were entered upon the minutes of the board, and their names deposited in the jury box. Also, that a large number of the persons selected by the board at the time were selected from old jury lists of said County of Elko, and that many of the names so selected were there suggested, designated, and recommended by the said Dawley. The court heard the testimony of several witnesses relative to the manner of selecting the trial jurors for the county for the year in question, and then made his finding, and delivered his decision on the motion as follows: "From the testimony produced here on the hearing of the challenge, the court finds that all of the persons whose names were put on the jury list were selected by the board of county commissioners; that none of them were selected by Mr. Dawley as alleged in the challenge, and also find that it is not true that selections were made from old jury lists, although if a jury list had been used by the commissioners for the purpose of finding out the names, it would have been perfectly proper. The book used was a book showing jury service, and it was proper for the commissioners to consult the book. I do not find that, although Mr. Dawley in certain cases said that certain men would be good jurymen; I do not find that in any such case the commissioners failed to exercise their own judgment in making up the list. There has been no injury shown to the defendants. For these reasons there has been no material departure from the forms prescribed by the statute. The challenge is disallowed."

We have carefully reviewed the transcript of the evidence in the record upon the motion, and think the same fully supports the findings and conclusions of the trial court. Mr. Dawley was the clerk of the court, as well as the clerk of the

board of county commissioners. He had kept a record of jury service which covered a period of nearly ten years. Although he could not legally select, nor properly urge the selection of any juror, we see no objection to the board of county commissioners taking advantage of information in the possession of their clerk, so long as they exercise their own judgment in conformity with the statute, and that, we think, the evidence shows they did in this case. If any of the men whom Mr. Dawley said would make good jurors were put on the general list of two hundred and fifty-five for the year by the commissioners, before or after he had so stated, it is not shown that any of them were among the twelve who tried the defendants, or were on the panel drawn from the box and in attendance on court at the time of the trial. It cannot, we think, be said, nor was it claimed, that defendants did not have the benefit of a fair and impartial jury; nor that they were deprived of any substantial right, or were in any way prejudiced by the manner in which the jury was selected. (12 Ency. Pl. & Pr. 277.)

2. It is contended that the indictment is defective, and that the court should have sustained defendants' objection to the same. The body of the indictment reads as follows:

"Defendants Johnny, an Indian (whose other name, if any, is to the grand jury unknown), and Joe Ibapah, an Indian (whose other name, if any, is to the grand jury unknown), are accused by the grand jury of the County of Elko, State of Nevada, by this indictment of the crime of murder, committed as follows, to wit: That the said defendants Johnny, an Indian, and Joe Ibapah, an Indian, on or about the 27th day of December, A. D. 1905, in the County of Elko, State of Nevada, and before the finding of this indictment, without authority of law, feloniously, wilfully, unlawfully and of their malice aforethought, killed a certain human being, herein designated as Fred Foreman, whose true name is to the grand jury unknown, by striking, cutting, and stabbing the said Fred Foreman with knives; whereof, and by means of the striking, cutting, and stabbing aforesaid, the said Fred Foreman then and there died."

Counsel for appellants claim that the indictment is defect-

ive in this: "That it does not in the body thereof charge the
defendants of the crime of murder or state that murder was
committed." Also, that "the specific acts alleged, viz., the
cutting, etc., are not alleged to have been done with intent
to kill." The indictment follows substantially the form sug-
gested by our statute. (Comp. Laws, 4200.) The act charged
as the offense is, we think, clearly and distinctly set forth in
ordinary and concise language, and in such a manner as to
enable a person of common understanding to know what is
intended, and with such a degree of certainty as to enable a
court to pronounce judgment upon a conviction according to
the right of the case, and it is therefore sufficient. (Comp.
Laws, 4208.)

3. After the state had rested its case, counsel for the
defendant Johnny, announced that his client, also, rested,
and on his behalf moved "that the case be given to the jury
at this time before any testimony is offered on behalf of the
defendant Ibapah." Counsel then stated to the court, as a
reason for making the motion, that "Mr. Taber, counsel for
Ibapah, informs me that the defendant Ibapah will take the
stand in his own behalf, and I believe Ibapah's testimony
will be prejudicial to the defendant Johnny." The court,
after taking time to consider the motion, denied it, and this
ruling is assigned as error.

Sections 360 to 362, inclusive, of our criminal practice act
(Comp. Laws, 4325–4327) provide as follows:

"4325. Sec. 360. When two or more defendants are jointly
indicted for any offense, they shall be jointly tried, unless
for good cause shown by the prosecution or defense, the
court shall otherwise direct.

"4326. Sec. 361. When two or more persons are included
in the same indictment, the court may at any time before the
defendant has gone into his defense, on the application of
the district attorney, direct any defendant to be discharged
from the indictment, that he may be a witness for the people.

"4327. Sec. 362. When two or more persons are included
in the same indictment and the court is of opinion that in
regard to a particular defendant there is not sufficient
evidence to put him on his defense, it shall order him to be

discharged from the indictment, before the evidence shall be deemed closed, that he may be a witness for his codefendant."

A defendant, jointly indicted with another, who intends to demand a separate trial, must make his motion before the formation of the jury is commenced. (*State* v. *McLane*, 15 Nev. 359.) To have permitted the defendant Johnny to have his case submitted and determined upon the conclusion of the state's case, would, in effect, have given him a separate trial, which would not only have been in plain violation of the statute, but might have been fatal error so far as Ibapah's case was concerned. Counsel for defendant Johnny, in his brief, says: "It is the privilege of a defendant jointly tried with another, when there is little or no evidence against him and he is willing to be tried on the evidence of the prosecution, to demand that the jury pass upon his case before the other defendant opens his defense; and the jury should be charged by the court, and consider their verdict as if the case had no connection with any other." To support this contention counsel cites *Vybee* v. *State*, 36 Tex. 366. We think counsel's position is not only not supported by the authority cited, but that it is clearly not the law. We quote from the authority cited the following: "After the defendants had withdrawn their motion for a severance, and elected to be jointly tried, they could at any time after the state had closed its evidence, if there was little or no evidence against one or the other of them, have demanded that the jury should decide upon the case of such one of them; and in all such cases the jury should be charged by the court, and they should consider of their verdict, in the same manner as if the case had no connection whatever with any other, and their verdict should be guilty or not guilty, as the case may be." It is clearly shown by the decision that both of the defendants must join in the request for such a submission, and that the purpose of it is so that the other defendant "shall not be deprived of the evidence of codefendants who are not inculpated by the state's evidence." In this state we have a simpler way of accomplishing the same result. See Comp. Laws, 4327, *supra.* In any event, both under the Texas procedure and that of this state, there

must not be sufficient evidence, in the judgment of the court, to put him on his defense before his codefendant can, in the manner required, avail himself of his testimony if he so desires. Johnny was not in the fortunate position that it could be said there was little or no evidence against him, nor was the purpose sought to be accomplished by the submission of his case upon the close of the state's testimony, the use of his testimony in behalf of his codefendant.

4. Confessions of the defendant Ibapah were admitted in evidence, over the objection of his counsel that it did not appear that such confessions were given voluntarily; but, upon the contrary, were obtained by reason of fear, inducements, and threats. One of these confessions was made to the officers upon the evening of the defendant's arrest, and before he was placed in jail. The other confession was made the following morning, in the presence of the sheriff, to representatives of the local newspapers. The latter confession was reduced to writing, read over to the defendant, and signed by him by affixing his mark thereto. The first confession was made while the defendant was in the custody of Guy Harbin, the deputy sheriff, a Mr. Brown, and a Mr. Stanley, during the temporary absence of the sheriff. It would appear from the evidence that the defendant was told by Mr. Stanley that the defendant Johnny had told of the crime, and that he further said to him: "You might as well tell the truth." Beyond this there does not appear to have been anything said to the defendant to induce him to make a confession. Counsel placed the defendant Ibapah upon the stand to recite the circumstances of the confession, but he did not vary in any particular degree in his testimony from that recited by the witness for the state. He did, however, say that it was Mr. Harbin who told him that "Johnny had already told about it." He then testified: "When he told me that it scared me more. Everything that I told then was true. I was scared very much that night." All that can be made of the defendant's testimony is, that he was scared when he made his confession to Harbin, but he iterates upon the stand that what he told that night was the truth. The only object in excluding testimony given

under threats, duress, or upon promise of reward, is, that such testimony might not be the truth.   A defendant cannot be prejudiced by the admission of a confession which he volुntarily acknowledges, under oath, is the truth.   But the fact that he was imbued with fear occasioned by his arrest and a knowledge of guilt, would not alone make his confession inadmissible.   All that has been said about the confession made by the defendant Ibapah to Deputy Sheriff Harbin and the others, upon the evening of his arrest, will apply to his confession made the following morning to the newspaper men.   The sheriff testified as follows with reference to the latter confession: "When Ibapah was brought out, I told him if he felt like it he could make a statement to these men. I told him that it was not necessary unless he wanted to, and he said he would tell them."   Even if there was a question as to the admissibility of these confessions, the error, if any, became cured when the defendant became a witness in his own behalf, and corroborated every statement contained in his various confessions. (*People* v. *Ketchum*, 73 Cal. 635, 15 Pac. 353; *People* v. *Daniels*, 70 Cal. 521, 11 Pac. 655; 12 Cyc. 466.)

5.   After Ibapah had testified in his own defense, and rested his case, counsel for. Johnny called as a witness Antelope Jack, Chief of the Goshutes, to testify to the character of Ibapah.   To his testimony counsel for Ibapah interposed the following objections:   "I object to placing any witness on the stand with reference to Ibapah by the codefendant Johnny, as it cannot possibly touch the question as to who was the instigator of this crime."   The objection was overruled, and we quote from the record the following testimony of the witness:   "My name is Antelope Jack.   I live at Deep Creek.   I live there long time.   I know Ibapah, since he was small boy—ever since his father give him whisky.   Ibapah's father all the time give him whisky.   He is a good boy—everybody know he is a good boy.   Everybody think when he grow up he was a good boy.   Last summer Indians think about him, maybe he kill white man and maybe he kill Indian.   Everybody around Deep Creek is afraid of Ibapah.   Ibapah was a little boy when his father

first gave him whisky. I think Ibapah was a good boy when he was little. When he was a boy he was always a good boy. When he get big everybody was afraid of him. When he got drunk he was bad. When he was not drunk he good boy." Conceding, without deciding, that it was error to have admitted this testimony, we are unable to see how it could have been prejudicial to the defendant Ibapah. Ibapah had already testified that he had killed the deceased by cutting his throat while Johnny held his hands, and that thereafter they had thrown the body upon the fire. He was not seeking to establish innocence of crime, but his effort was directed to avoiding a conviction of murder in the first degree, by showing that he was in a drunken condition at the time he killed the deceased, and was therefore incapable of that premeditation which is an essential element of murder in the first degree. Evidence which tended to show that intoxicating liquor had the effect of transforming him from a good boy into a dangerous character, we think could not have prejudiced the defense, but would rather tend to strengthen it.

6. Counsel for Johnny assigns error in the refusal of the court to strike out, upon the ground that it was hearsay, the testimony of an Indian witness called "Captain Jim," who testified upon the part of the state to the effect that on the night of the killing the two defendants were at his camp, and that Ibapah said in the presence of Johnny that "Johnny held the man's hands while Ibapah cut his throat." We doubt if the record of this testimony will warrant a conclusion that it was hearsay. But, conceding that it was, the error in admitting it was harmless, for other witnesses testified to the same conversation, and Johnny, as a witness in his own behalf, also testified to the same effect. (*People* v. *Marseiler*, 70 Cal. 98, 11 Pac. 503.)

7. Upon the law of drunkenness as a defense to crime, the court gave instructions Nos. 26 and 27 of its own motion, and defendants requested instruction No. 5, which instructions read as follows:

"(26) It is a well-settled rule of law that drunkenness is no excuse for the commission of a crime. Temporary insanity, produced by intoxication does not destroy responsibility, when

the party, when sane and responsible made himself voluntarily intoxicated; and drunkenness forms no defense whatever to the fact of guilt, for, when a crime is committed by a party while in a fit of intoxication, the law will not allow him to avail himself of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. Evidence of drunkenness can only be considered by the jury for the purpose of determining the degree of the crime, and, for this purpose, it must be received with great caution.

" (27) In this case if you find that the defendants unlawfully and with malice aforethought, as already defined to you, killed the person designated as Fred Foreman, it is murder, and if such killing was wilful, deliberate, and premeditated, or was done in the perpetration or attempts to perpetrate robbery, it is murder of the first degree, otherwise it is murder of the second degree, and in determining the degree, any evidence tending to show the mental status of the defendants is proper for the consideration of the jury. The fact, if it be a fact, that the defendants were drunk, does not render the act less criminal, and in that sense it is not available as an excuse, but there is nothing in this to exclude it as evidence upon the question as to whether the act was deliberate and premeditated or was committed in the carrying out of an intent to rob. Presumptively, every killing is murder, but so far as the degree is concerned, no presumption arises from the mere fact of killing, considered separately and apart from the circumstances under which the killing occurred. The question is one of fact to be determined by the jury from the evidence in the case, and it is not a mere legal conclusion, and drunkenness, as evidence of want of premeditation or of an intent to rob, is not within the rule which excludes it as an excuse. Drunkenness neither excuses the offense nor avoids the punishment which the law inflicts, when the character of the offense is ascertained and determined, but evidence of drunkenness is admissible solely with reference to the question of premeditation, or where there is evidence tending to show that a murder has been committed in the perpetration or attempt to perpetrate a robbery, as to the question of the existence of the felonious intent to steal

which is an essential element of robbery. In cases of premeditated murder, the fact of drunkenness is immaterial. A man who is drunk may act with premeditation as well as a sober one, and is equally responsible for the consequences of his act. In murder of the first degree, it is necessary to prove the killing was premeditated or was committed in the perpetration or attempt to perpetrate robbery or one of the other felonies already enumerated, which involves, of course, an inquiry into the state of mind under which the party committed it, and, in prosecution of such an inquiry, his condition as drunk or sober is proper to be considered. The weight to be given it is a matter for the jury to determine, and it should be received with great caution and carefully examined in connection with all the circumstances and evidence in the case. You should discriminate between the conditions of mind merely excited by intoxicating drink and yet capable of forming a specific and deliberate intent to take life, and such a prostration of the faculties as renders a man incapable of forming the intent, or of deliberation or premeditation. If an intoxicated person has the capacity to form the intent to take life, and conceives and executes such intent, it is no ground for reducing the degree of his crime that he was induced to conceive it, or to conceive it more suddenly by reason of his intoxication."

Defendants' requested instruction No. 5: "You are instructed that in order to find the defendants or either of them guilty of murder in the first degree you must find from the evidence beyond all reasonable doubt that the murder was perpetrated by means of poison, or lying in wait, or torture, or by any other, wilful, deliberate, and premeditated killing, or in the perpetration or attempt to perpetrate robbery. This ingredient of deliberate premeditated killing must be clearly shown and proven beyond all reasonable doubt. It is not sufficient that you think that the killing was deliberate and premeditated; the evidence must convince you of that fact to an abiding certainty and beyond all reasonable doubt. The evidence of deliberation and premeditation must be such as to convince you that the deliberate premeditated design and purpose to murder was know-

ingly and intentionally formed and considered in the mind of each defendant and meditated upon before the fatal blow was struck; and, in considering whether such a design was formed in the minds of each of the defendants, you should consider the evidence, if any, of drunkenness. If the defendants were drunk at the time, and were too much intoxicated to form such a deliberate and premeditated purpose, they cannot be found guilty of murder in the first degree. It is true that drunkenness is no excuse for the commission of an offense, but nevertheless the jury must consider the evidence of drunkenness and determine whether it was sufficient to so cloud the minds of the defendants as to interfere with the formation of deliberate and premeditated purpose to kill. If the drunkenness was sufficient to create a reasonable doubt in your minds as to the existence of such a deliberate premeditated purpose you cannot find the defendants guilty of murder in the first degree."

Counsel for defendants attack the court's instruction No. 27 as being an erroneous statement of the law, ambiguous and misleading, consequently highly prejudicial to the defendants. The instruction complained of was doubtless copied in the main from an instruction that has a number of times met with the approval of the Supreme Court of California. (*People* v. *Williams*, 43 Cal. 345; *People* v. *Belencia*, 21 Cal. 545; *People* v. *Lewis*, 36 Cal. 531; *People* v. *Ferris*, 55 Cal. 592; *People* v. *Jones*, 63 Cal. 168; *People* v. *Vincent*, 95 Cal. 425, 30 Pac. 581.) The instructions upon the law of drunkenness, as applicable to this case, should be considered together. The jury, we think, were fairly and correctly instructed upon this point of the law. (*People* v. *Leonardi*, 143 N. Y. 364, 38 N. E. 372; *State* v. *Hawkins*, 23 Wash. 289, 63 Pac. 258; *Wilson* v. *State*, 60 N. J. Law, 171, 37 Atl. 954, 38 Atl. 428; *Hopt* v. *People*, 104 U. S. 632, 26 L. Ed. 873; *Booher* v. *State*, 156 Ind. 447, 60 N. E. 156, 54 L. R. A. 391; *State* v. *Thompson*, 12 Nev. 151.) See, also, 21 Cyc. 670; McClain on Cr. Law, 162.

8. The refusal of the court to give certain requested instructions upon the law of manslaughter was not error, as there was no evidence tending to reduce the offense to the

grade of manslaughter. (*State* v. *Donovan*, 10 Nev. 36; *State* v. *Millain*, 3 Nev. 409; *Pirtle* v. *State*, 9 Humph. 663; *State* v. *Weaver*, 35 Or. 415, 58 Pac. 109.)

9. A number of instructions requested by defendants were refused by the court, either upon the ground that they were inapplicable to the case, or that they were covered by instructions already given. A careful examination of these requested instructions convinces us that the court did not err in their refusal. (*State* v. *Buralli*, 27 Nev. 54, 71 Pac. 532; *State* v. *Maher*, 25 Nev. 465, 62 Pac. 236.)

10. It is contended that the instruction given at the request of the prosecution relative to the consideration which the jury should give to the defendants' testimony, was erroneous and prejudicial. This instruction, substantially as given by the court in this case, has heretofore in a number of cases been approved by this court. (*State* v. *Hartley*, 22 Nev. 360, 40 Pac. 372, 28 L. R. A. 33; *State* v. *Streeter*, 20 Nev. 403, 22 Pac. 758; *State* v. *Hing*, 16 Nev. 307; *State* v. *Hymer*, 15 Nev. 49.) The following language of the instruction is that to which exception is particularly taken: "If convincing and carrying with it a belief in its truth, *you have a right* to act upon it; if not, you have a right to reject it," etc. As this instruction has been given in other cases in this state, the words we have italicized have been omitted. It is urged by counsel here that the use of these words was, in effect, a direction to the jury that it was entirely optional with them whether they should act upon the testimony of the defendants, even though they believed in the truth of the same. While we think it would have been clearer to have omitted from the instruction the words in question we do not think it at all probable that the jury placed any such construction as contended upon them. In another instruction the jury were told that they "must consider all the evidence," etc. That a jury would fail to give due consideration to the testimony of a defendant, which was convincing and carried with it a belief in its truth, is too unreasonable for consideration. We have no hesitancy in saying that the defendants were not prejudiced by this instruction.

There are some other alleged errors in the record, but we

have examined them, and think they are not of sufficient
merit to require notice here.    Counsel for defendants have
dwelt in their briefs upon the point that the defendants were
Indians, and that, as a matter of general knowledge, intoxi-
cating liquor more readily destroys the mental faculties of
the Indian than it does those of the white man.    It is further
argued that the very revolting manner in which this crime
was committed tends strongly to prove that at the time the
crime was committed the defendants were impelled to commit
the murder because of their drunken condition.    We may
concede all that counsel has to say upon this question.    This
case serves as a terrible illustration of what may result from
the crime of disposing of spirituous liquors to Indians.
Liquor has the effect of arousing in the Indian all the
dormant savagery and cruelty of his nature.    It is a crime
in this state to dispose of liquor to Indians, and it may not
be out of place here to say that the violation of this law
doubtless led to the revolting murder committed by these
two defendants.    The statute of this state applies the criminal
laws to the Indians, without reservation, other than where
the offense is committed by one Indian against another upon
a government reservation.    (Comp. Laws, 4655.)    Upon the
trial for an offense, they are subject to the same laws, rules,
and conditions as govern in the case of a white man.    The
case appears to have been very carefully tried in the lower
court.    We have examined all of the assignments of error,
and our conclusion is that the judgment of the trial court
must be affirmed.

The judgment and order denying the motion for a new
trial are affirmed, and the district court is directed to fix a
time and make all necessary and proper orders for having its
sentence carried into effect by the warden of the state prison.