THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LEILA NAZARIO, Defendant and Appellant.

Nos. 6924 and 6947. Argued April 7, 1938.—Decided May 31, 1938.

Alfonso Lastra Chárriez for appellant. R. A. Gómez, Prosecuting Attorney, for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

These two appeals were submitted upon the same brief and will be disposed of by a single opinion herein. The cases were prosecuted before the District Court of San Juan, by one of its district attorneys, upon two informations, in one of which Leila Nazario de Martínez was charged with murder, in that on May 21, 1934, in San Juan, she wilfully and unlawfully killed, with malice aforethought and the deliberate intention to kill, Rafaela Pardo, a human being, assaulting and attacking her with a revolver and inflicting several bullet wounds upon her as a result of which she died on the same day; and in the other the same defendant was charged with the offense of carrying a weapon, committed by carrying on her person on the said date, in San Juan, for purposes of offense and defense, a revolver, which is a weapon the carrying of which is prohibited by law.

On June 19, 1934, the defendant personally appeared before the court assisted by her counsel. The informations

were read to her. Thereupon she entered a plea of not guilty and requested that the trial for murder be held before a jury and that in the case for carrying a prohibited weapon the judgment be rendered on the evidence introduced in the murder trial.

On January 29, 1935, the trial by jury was begun. It ended on the following February 2. The jury found the defendant guilty of voluntary manslaughter.

A date having been fixed for the pronouncement of the sentence, a postponement of such action was requested in order to enable the defense counsel to determine the procedure. to be followed in view of the. verdict returned by the jury. The attorney who represented the defendant during the trial withdrew, and her representation was assumed by Attorney Alfonso Lastra Chárriez who, on March 7, 1938, presented a motion for investigation of the mental state of the defendant at different periods of time, for a new trial, and for other purposes.

The court fully heard both parties on this motion and by a reasoned decision of April 11, 1935, denied the motion and set the following 17th for the pronouncement of sentence. On that day it sentenced the defendant to three years' imprisonment in the penitentiary for the crime of voluntary manslaughter and to one month in jail for that of carrying a prohibited weapon.

After the appeals from the decision of April 11, 1935, and from both judgments had been taken, there arose several incidents with regard to the preparation, free of charge, of the transcript of the stenographic notes, which delayed the progress of the appeals. The hearings upon the latter were finally held on April 7th last.

Only one error is assigned by the appellant in her 64-page brief. It is claimed to have been committed by the trial court "in refusing to follow the course of action proposed in her petition entitled 'Writ of Error *Coram Nobis*.'"

Such a course of action was as follows:

1. To annul the verdict on the strength of the medical evidence introduced and the testimony of the former attorney and the present counsel of the defendant and of the widow of Nazario, defendant's mother, and to grant a new trial in accordance with sections 439 and 303, subdivision 6, of the Code of Criminal Procedure.

2. To entrust the investigation of the mental state of the defendant to a board of experts, because there was a substantial doubt as to her sanity during the course of the trial and at the time the verdict was rendered, so that the court based on the technical finding made, could annul the verdict and grant a new trial. Sections 440, 441 and 442 of the Code of Criminal Procedure.

3. To appoint a board of experts to investigate and finally decide upon the mental state of the defendant at the moment that she was to be sentenced, and if the decision should be that she was insane, then that the court should suspend the pronouncement of that sentence in accordance with the law.

The writ of *coram nobis* or *coram vobis* had its origin in the English common law. It was issued in order to correct a judgment by the same court which had rendered it. It may be distinguished from the ordinary writ of error in that the latter is interposed because of the commission of an alleged error of law which arises from the record, the case being taken to a superior court which decides the question and affirms, modifies, or reverses the judgment, while the former is based on errors of fact which do not arise from the record, the case being left in the trial court itself which is able to correct the error under the presumption that had it known the true facts it would never have committed it.

Although by reason of the establishment of other statutory remedies which cover the field, it is not often used, it still exists and has been successfully used upon several occasions. In 2 Ruling Case Law 307, 308, when discussing the scope of the writ, various cases in which it has been used

are cited. There it is said—the text being based on cases from Kentucky, Maine, Indiana and West Virginia, reported in 32 Am. Dec. 68, 74 Am. Dec. 503, 44 Am. Rep. 29, 18 L.R.A. 840 and 19 L.R.A. 762—that:

".... As regards the effect of the lunacy of the defendant at the time the judgment was rendered against him, which fact was not presented to the court, the authorities are in conflict, although both text writers and the courts have asserted that it is ground for relief by writ of error *coram nobis*. Also where the accused was insane at the time of his conviction cases holding that he may secure relief by the writ are to be found. On the other hand, there is good authority for the proposition that a writ of error *coram nobis* will not lie on the ground of the defendant's insanity when the judgment was rendered against him, and that relief must be sought in equity."

■ Of course, the writ is not issued unless it appears with reasonable certainty that a substantial error of fact was committed. 46 Am. Dec. 260. It has been decided that the discretion exercised by a court in denying it is not reviewable on appeal. 34 Am. Dec. 395, and note.

It is unnecessary to pursue our study into the matter further, because in Puerto Rico the question raised is governed by statute. What has been said is sufficient to satisfy the historical interest which it arouses and to aid in the proper interpretation of the procedure in force in harmony or in accordance with its original source.

Section 439 of the Code of Criminal Procedure (1935 ed.) says: "A person can not be tried, adjudged to punishment, or punished for a public offense, while he is insane," which principle serves to bring out the effect of civilization on this subject.

The same code subsequently sets out the procedure to be followed when the necessity for applying such principle arises. It is the following:

"Section 440.—When an action is called for trial, or at any time during the trial, or when the defendant is brought up for judgment on conviction, if a substantial doubt arise as to the sanity of the

defendant, the court must order the question as to his sanity to be submitted (to) three experts designated by the court, and the trial or the pronouncing of the judgment must be suspended until the question is determined by their decision, and the trial jury may be discharged or retained, according to the discretion of the court, during the pendency of the issue of insanity.''

Then follow sections 441 to 444 of the Code which regulate the manner in which the experts should act, the effect of their testimony, and what should be done with the defendant if he should be pronounced insane. *Iturrino* v. *District Court,* 50 P.R.R. 892.

 What happened in this particular case was as follows: The new defense counsel alleged in his motion that he had learned for the first time ''by his own observation, and by the professional opinion of alienists reputed in the community to be authorities on mental diseases, that the above-mentioned Leila Nazario was mentally deranged.'' Furthermore, he alleged that he inquired of the former Attorney Martínez Nadal what the conduct of the defendant had been and said attorney told him that he was never able to make his client understand the precarious position in which she found herself nor to obtain from her any material for her defense, the defendant being nervous on some occasions, indifferent at other times, and always showing a degree of unconsciousness which prevented her from aiding her attorney in her interest. He stated that Leila Nazario had been mentally deranged before, from January 25, 1935, to the following February 3, that is, during the holding of the trial, and thereafter.

He accompanied his motion with a medical certificate from Doctors Mario Fernández and M. Quevedo Báez, another certificate of the testimony given by Dr. Fernández at the trial, a sworn statement signed by Attorney Martínez Nadal, the instructions of the court to the jury, and the affidavits of María Dolores Rivera and the present defense counsel as to the state of insanity of the defendant.

At the hearing on the motion the district attorney introduced in evidence several affidavits which were admitted without objection, and copies of the results of analyses made.

The reaction in the mind of the trial judge as to the allegations, the former evidence presented anew, and the arguments of counsel, appears from his decision, as follows:

"From the moment of the arraignment until after the verdict the defendant was represented by Attorney Rafael Martínez Nadal. Notwithstanding the well-known ability of the defense counsel, at no time was it even insinuated to the court that the defendant was suffering from mental derangement while the trial was being held. The conduct of the defendant during the course of the trial was perfectly normal. Her principal defense was that she had been mentally deranged at the moment that she committed the criminal act, and that her faculties were so obscured that she could not distinguish between right and wrong. Evidence was introduced as to certain acts done by the defendant prior to the commission of the offense, and a doctor made a report on the various diseases which had afflicted her from her infancy. Her mother and Doctors Goenaga, Fernández, Lange and others also testified, and at no time was the court able to observe that the history of her infancy or the testimony of her mother or the statement of different acts which were imputed to her as indicative of her insanity, excited the defendant in any manner, or produced upon her any impression other than that of a normal person. She abstained from taking the stand, as is generally done by defendants in offenses of this type, but the court was never advised that the defendant was not exercising her right to testify by reason of the fact that she was suffering from mental insanity. She heard the argument of the district attorney and of the defense counsel unmoved, and later she heard the verdict of the jury without revealing an abnormal state of mind."

The judge once again referred to the motion, the grounds of which he had previously stated, and cited from 16 C. J. 1327 among other principles the following: "The writ of error *coram nobis* does not lie to correct an issue of fact which has been adjudicated, even though wrongly determined; . . . Further, it is not available when the facts complained

of were known before the trial, and where advantage could have been taken of the alleged error at the trial." He went on to say:

"In the instant case the defense of insanity was submitted to the jury. Ample evidence was introduced both as to the facts and by way of expert testimony to prove that the defendant was insane at the moment that she committed the acts with which she is charged. The jury heard all this evidence as well as that which was presented in opposition thereto by the district attorney, received instructions from the court concerning the defense raised by the defendant, and after deliberating for many hours, considering the defendant responsible for her actions at the time of the commission of the crime charged, returned a verdict of guilty of voluntary manslaughter. So that the facts now alleged as a basis for the writ of error *coram nobis* were submitted to the jury and there was an adjudication when the verdict was rendered, all of which, as we have shown, makes the writ of error *coram nobis* inapplicable.

"Nor should the new trial requested in this case be granted, because in our opinion the verdict of the jury is neither contrary to law nor against the evidence. It is alleged that the verdict of the jury is contrary to law and against the evidence because the defense insists in maintaining that Leila Nazario was insane at the time she committed the crime.

"From the year 1843 in which Lord Chief Justice Tindall, in the case of M'Naghten, in answer to a consultation made to him by the House of Lords, laid down the course to be followed in order to determine the criminal responsibility in cases of insanity, that is, that every person is responsible for his acts unless at the time of their commission such person is unable to distinguish between right and wrong, from that date, we repeat, it has been established by the authorities in England as well as in the United States, that not every person who is mentally diseased can be relieved from responsibility for his or her actions. A person who is a mental case before the doctor, as for example, one who suffers from irresistible impulses, from hallucinations, or extravagant manias, is not insane in the eyes of the law if in spite of his irresistible impulse, of his hallucinations, or of his manias, he is conscious, when he commits an act, that the same is contrary to law and consequently that he is doing wrong. In this case evidence was introduced which tended to show the conduct of the defendant on various occassions, thus

attempting to prove her lack of responsibility when she committed the act charged. Evidence was introduced that while she was in a state of pregnancy she had the mania of chewing salt; that on a certain occasion she took an automobile and drove it at a high rate of speed over the streets of Santurce, disregarding the order of the police to stop until her husband being informed of her action was able to overtake her; that on another occas on when a witness ar- rived at her house he saw her coming out of a room tearing her clothes, etc. On the other hand, the evidence and the testimony of eyewit- nesses disclosed a circumstance which undoubtedly served as a basis for the jury to decide the conflict in the evidence as to the responsibility of the defendant, and it was the following: According to the evidence, when the deceased Rafaela Pardo was fleeing to the news stand, the defendant ran after her with a revolver in her hand. When she entered the news stand the deceased grasped the owner of the establish- ment asking for protection. Meanwhile the defendant remained with the revolver in her hand and it was not until the owner of the stand was able to free herself from the deceased that Leila Nazario fired the shots at the victim. This circumstance clearly shows that the defendant was perfectly aware that the person whom she intended to kill was not the owner of the news stand but the other person of whom she was jealous, against whom she had a motive, in other words, her rival Rafaela Pardo. That circumstance by itself shows that at the moment that the defendant committed the offense she had sufficient capacity to distinguish between right and wrong, for otherwise she would have acted in the way that insane persons act; she would have fired her revolver against any one in front of her, whether that person was her worst enemy or her most beloved friend.

"For these reasons we believe that the jury correctly weighed the evidence submitted to it and, as the petition does not allege nor is the court aware that any error of law was committed during the trial or in the instructions to the jury, or any other irregularity, the verdict should not be annulled.

"Regarding the content on now made that the defendant was insane at the moment of the trial, what we have already said with respect to the conduct of the defendant during the trial is sufficient.

"The Supreme Court of California has said in the case of *People* v. *Gilberg*, 197 Cal. 306, decided in October 1925, that there is no one in a better position than the trial judge, to observe the conduct of the defendant during the trial, and that for this reason a wide

discretion is allowed him in determining whether or not the defendant should have been submitted to an examination by expert witnesses.

"The alienists Doctors Mario Fernández and F. R. de Goenaga testified as experts and in spite of having been in contact with the defendant while the trial was being held, neither of them stated that the defendant was insane at that time. In the testimony of Dr. Mario Fernández, which was very extensive, it is never suggested that the defendant was suffering from a mental derangement at the time that he was testifying. He confined himself to the mental condition of the defendant at the time of the commission of the crime. The same may be said with regard to the testimony of Dr. Goenaga.

"Dr. Pereira Leal, to whose clinic the defendant was taken and where she underwent an operation several months after the crime had been committed, testified that he observed nothing abnormal in the mental condition of the defendant while she remained at his clinic and that had he observed it he would have referred the case to an alienist because as he testified 'he does not operate on insane people'.

"There was more than one opportunity for any of these doctors who for several days, while the trial was going on, were in contact with the defendant to make some reference even to her mental condition during those days.

"The testimony of Attorney Martínez Nadal as to the attitude of the defendant during the trial, knowing as we do his recognized ability as a criminal lawyer, can only be explained by us if we consider his natural desire not to appear as in any way interfering with his colleague who has substituted him in the representation of the defendant.

"Referring now to the last part of the motion, that is, to the allegation that the defendant is at present suffering from insanity, we hold that the granting of a new trial would not be proper, and that the case can not be submitted to a board (*jurado*) of medical experts, because the court has no real doubt with regard to the present mental capacity of the defendant. The evidence now introduced to show that the defendant is insane, is the same as the one which was heard and weighed by the jury when it rendered the verdict of guilty in this case. The only new evidence introduced is a certificate from Dr. Quevedo Báez whose conclusions are based on the same evidence submitted to the jury with regard to the acts

committed by the defendant before and after her commission of the offense, and the fact that the defendant is now confined in the insane asylum.

"＊ ＊ ＊ ＊ ＊ ＊ ＊

"It is really strange that notwithstanding the insanity of the defendant at the time when she committed the crime and during the several days of the trial, none of her relatives should have thought of taking her to an insane asylum until many days after the last move had been made in the legal contest which ended in a verdict of guilty on February 2d last. If the defendant was really insane, why was she not immediately confined in an asylum thus saving her from suffering the *via crucis* of a trial for murder with all its consequences?

"But there is something else which we must not overlook in deciding this last question. During the hearing on the motion, the district attorney introduced in evidence an affidavit of Dr. Luis M. Morales, a specialist in mental and nervous diseases, in which he states that on the 26th of last February he performed a lumbar punction upon the person of Leila Nazario, extracting some spinal fluid (*céfalo-raquídeo*) which the witness labeled 'Leila Nazario, Insular Insane Asylum' and sent to the biological laboratory of the Department of Health. The district attorney also introduced at that time an affidavit of Carlos Bou, who since 1929 has held the position of Serological Assistant in the Biological Laboratory and who was sent by the Rockefeller Foundation to the United States where for a period of six months he made special studies in serological technique such as the Wassermann and Kahn, and also in spinal fluid, and in reactions of colloidal gold, the deponent stating that on February 28, 1935, he made a Wassermann and Kahn test of some blood labeled 'Leila Nazario,' sent from the Insular Insane Asylum, and that on the same day, February 28th, he made a Wassermann test and a test with colloidal gold of some liquid labeled 'Leila Nazario'. That when he read the results of these tests and upon seeing the name of Leila Nazario in a case which had been under investigation in the courts of Puerto Rico, he took the tests personally to the director of the laboratory, Dr. Oscar Costa Mandry, so that he might personally observe the results of those tests, which were negative both as to the Wassermann reaction and the Kahn reaction. That the result of the liquid was negative as to the Wassermann reaction and also as to the Lange reaction."

The trial judge then transcribed the statement of Dr. Costa Mandry, introduced by the district attorney at the hearing on the motion, with regard to the negative result as to syphilis in the blood and spinal fluid tests of Leila Nazario, and he concluded his opinion by saying:

"Thus, while it is insisted that the defendant is now insane and that the cause of her insanity is hereditary syphilis, the laboratory finds no evidence whatsoever of what is alleged as the cause of such insanity.

"Fruthermore, the certificate which served as a basis for confining the defendant in the Insular Insane Asylum was founded on conclusions and inferences from the clinical history of the defedant, which history was heard and considered by the jury before the rendition of the verdict. *People* v. *Sloper*, 198 Cal. 238.

"We do not agree with the contention of the defense that by the mere fact that the defendant offered, and the court admitted, evidence for the purpose of determining whether or not she was insane at the time of the commission of the crime, and that the jury received instructions upon the defense of insanity, the court is bound to entertain a substantial doubt with regard to the abnormality of the defendant and to grant her a new trial or submit her to a jury of experts. In no case can the court prevent the defendant from introducing evidence of insanity at the time of the offense, as long as such evidence is presented in accordance with the provisions of the Law of Evidence; and once said evidence is introduced the court is bound to instruct the jury upon the law concerning the defense of insanity. The Supreme Court of California in the citation which we have made from the case of *People* v. *Sloper, supra,* seems to indicate the contrary to what has been maintained by the defense."

We have analyzed the evidence introduced and have considered all that has been said by counsel for defendant in his brief, and we are of the opinion that the decision of the court reveals a careful and profound study of the question presented to it and a full accord with the law and the jurisprudence in deciding the same.

The court was not bound to grant the petition by the mere fact that the same was filed with accompanying affidavits. It discharged its duty by opening the question to dis-

cussion and to proof. It had power to decide it in accordance with the facts and the law, in the exercise of its discretion. We have seen that the courts have gone so far as to decide that such discretion can not be reviewed on appeal. An abuse of discretion would have to be shown before an appellate court would be justified in ordering a reversal. And in this case, apart from the fact that in reality there was involved only a question of fact which not only appeared from the record when the motion was filed but also was decided adversely by the jury as to the existence of insanity at the time of the offense, and could have been raised, as to the existence of insanity at the time of trial, while said trial was being held, apart from that, we repeat, what the record reveals is not an arbitrary but a sound exercise of judicial discretion in deciding the question of fact presented which was considered anew, as if it did not appear from the record before the motion was filed.

Those poor human beings, like Leila Nazario, who commit passional crimes are indeed diseased, but they are not irresponsible lunatics, incapable of distinguishing between right and wrong. If the trial court was at fault in anything in this case it was in being too lenient when it imposed the penalty.

The order and judgments appealed from should be affirmed.