[Crim. No. 2806. In Bank.—February 26, 1926.]

## THE PEOPLE, Respondent, v. FELIX SLOPER, Appellant.

[1] CRIMINAL LAW—INSANITY AS A DEFENSE—ABILITY TO KNOW AND DISTINGUISH BETWEEN RIGHT AND WRONG.—In order that insanity may be availed of as a defense to crime, it must appear that the defendant, when the act was committed, was so deranged and

1. Test of insanity as a defense to crime, note, 36 **Am. Dec.** 407. See, also, 7 **Cal. Jur.** 862; 14 **R. C. L.** 599.

diseased mentally that he was not conscious of the wrongful nature of the act committed. If he has reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal, and will subject him to punishment, he must be held responsible for his conduct.

[2] ID.—PARTIAL INSANITY—RESPONSIBILITY FOR CRIMINAL ACTS.—Although the defendant may be laboring under partial insanity—as, for instance, suffering from some insane delusion or hallucination—still, if he understands the nature and character of his action and its consequences—if he has knowledge that it is wrongful and criminal, and that if he does the act he will do wrong—such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from the responsibility for his criminal act.

[3] ID.—LEGAL RESPONSIBILITY FOR CRIMINAL ACTS—PROVINCE OF JURY.—Whether the accused was at the time he committed the act for which he is upon trial legally responsible therefor, as responsibility is defined by the law, is a question of fact entirely within the province of the jury; and the mental test is but a standard by which responsibility is to be measured.

[4] ID.—MURDER—INSANITY AS DEFENSE—EVIDENCE—VERDICT—APPEAL.—In this prosecution for murder, in which counsel for the defendant attempted to establish insanity as a defense, after reviewing the evidence the appellate court was convinced, as the jury must have been convinced, that the defendant was legally responsible for the commission of the crime of which he was convicted.

[5] ID.—INSTRUCTIONS—CONVERSE DOCTRINE.—In such a prosecution, if the instructions tendered by the people, and which are given, are sound expositions of the law of insanity, the defendant's proposed instructions, which announce a converse doctrine, are properly refused.

[6] ID.—SIMULATION OF INSANITY—INSTRUCTIONS.—In this prosecution for murder, in which the defendant relied upon insanity as a defense, the error, if any, in giving an instruction on the subject of simulation of insanity as a defense resulted in no miscarriage of justice or prejudice to the defendant—although it would have been better not to have given such instruction.

2. Partial insanity, note, 76 Am. St. Rep. 87. See, also, 7 Cal. Jur. 864; 14 R. C. L. 603.

3. See 8 Cal. Jur. 278; 14 R. C. L. 607.

5. See 8 Cal. Jur. 314.

6. See 8 Cal. Jur. 628.

[7] ID.—INSANITY—BURDEN OF PROOF—INSTRUCTIONS.—In this prose-
cution for murder, in view of other instructions given in which
the jury was instructed that the defendant was required to es-
tablish insanity by a preponderance of the evidence and the bur-
den was upon him to do so, the defendant was not prejudiced
by one part of the general charge in which the court instructed
the jury that insanity is a defense to be weighed fully, fairly
and justly, and, when "satisfactorily established" must commend
itself to the sense of humanity and justice of the jury.

[8] ID. — VERDICT — SENTENCE — INSANITY — REFUSAL TO SUBMIT TO
JURY—DISCRETION OF TRIAL COURT.—In such a prosecution, the
trial court does not abuse its discretion in denying defendant's
motion, made at the time defendant appears for sentence, for a
stay of all proceedings on the ground that defendant is then
insane and that the question of his present insanity be submitted
to a jury, where such motion is based upon the evidence taken
at the trial, from which the jury by its verdict found the de-
fendant to be sane at the time he committed the murder, and no
showing is made that his mental condition had since changed.

(1) 16 C. J., p. 100, n. 12.  (2) 16 C. J., p. 102, n. 22.  (3) 30
C. J., p. 332, n. 43.  (4) 30 C. J., p. 304, n. 54.  (5) 16 C. J., p. 102,
n 25, p. 104, n. 31.  (6) 16 C. J., p. 973, n. 4.  (7) 16 C. J., p. 1050,
n. 84.  (8) 16 C. J., p. 1284, n. 74.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco. Harold Louderback,
Judge. Affirmed.

The facts are stated in the opinion of the court.

Harry A. McKenzie and William F. Herron for Appel-
lant.

U. S. Webb, Attorney-General, William F. Cleary, Deputy
Attorney-General, Matthew Brady, District Attorney, and
Harrison D. Skillin and Robert E. Fitzgerald, Assistant Dis-
trict Attorneys, for Respondent.

SEAWELL, J.—On April 16, 1925, the grand jury of the
city and county of San Francisco returned an indictment
against the defendant, Felix Sloper, accusing him of having

7. Presumption as to present insanity of defendant in criminal
case, note, 34 L. R. A. (N. S.) 1115. See, also, 8 Cal. Jur. 30.

unlawfully, with malice aforethought, killed one George W. Campbell, a police officer of the city and county of San Francisco on the ninth day of April, 1925. He was subsequently placed upon trial and the jury returned a simple verdict of guilty of murder of the first degree, and the law in such cases adjudges the penalty, which is death, and that penalty was accordingly pronounced by the court upon the verdict as returned. From the judgment of conviction and the denial of the defendant's motion for a new trial this appeal was taken. It was not contended in the court below, nor is it contended here, that the defendant did not fire the fatal shot which caused the death of said George W. Campbell, but it is claimed, first, that he should be relieved of the legal consequences of his act by reason of the alleged insanity of said defendant, and, secondly, that a new trial should be ordered because of the giving of certain instructions by the trial court which it is claimed were erroneous and prejudicial to the defendant. The latter will hereafter be briefly referred to.

The facts are brief and the questions of law are both simple and well settled. Some time prior to the ninth day of April, 1925, defendant formed the intent of robbing a branch bank of the Mercantile Trust Company, located at the southwest corner of Pacific and Hyde Streets, city of San Francisco, by overcoming by means of force and fear any resistance that might be made to his purpose by the employees in charge of said bank. Prior to the commission of the crime with which he is charged he had purchased a Nash automobile with funds which he had acquired by engaging in the illicit sales of intoxicating liquor. A few days prior to the ninth day of April he stole a Studebaker automobile, which he planned to use in the actual perpetration of the crime. As a means of confusing the identity of this stolen car he took from it the license plate that was upon it and placed another in its stead which he had stolen from still another automobile. On the day before the attempted robbery of said branch bank he made a reconnoitering tour in said Studebaker car to that locality and explored the bank premises and neighborhood with a view of further familiarizing himself with the situation pursuant to carrying out his purpose of robbing said bank on the following day. In accordance with his plan he drove to the bank

198 Cal.—16

building on the next afternoon—April 9th—and bided the
time when conditions would be most favorable for the execu-
tion of his purpose. The time selected was a few minutes
after 2 o'clock. He parked his machine at a convenient
place, with the engine running, and entered the bank at a
time when no one was present except its manager and two
tellers or employees. The manager of the bank was seated
at his desk on the business floor with nothing but an ordi-
nary low-rail partition separating him from the business
public. The defendant, in his preparation for the com-
mission of the crime, had purchased a new satchel in which
he expected to carry away the fruits of his crime, which he
carried with his left hand. Upon entering the bank he drew
a Colt's 38-caliber U. S. Army model revolver, and pointed
it at the manager, who was seated in the inclosure above
mentioned, whereupon the manager raised his hands. He
was ordered to put his hands down and commanded to pass
through the door leading into the cages where the paying
and receiving tellers were engaged. Upon entering this
compartment the defendant, closely following the manager,
ordered the other two employees, one a man and the other
a lady, who started to raise their hands, to put them down.
He then ordered said three persons to take positions facing
one another in group form, which gave them the appear-
ance, to passers-by who might by chance look into the bank
through the glass doors and windows, of being engaged in
ordinary conversation. While the manager and the em-
ployees were held in this position the defendant proceeded
to the places where the coin-guards and currency drawers
were, and, holding said employees under guard, placed
within the satchel which he carried some thirteen hundred
dollars of the bank's funds before attempting to make
his escape. In the meantime the manager of the bank
had stepped upon the burglar-alarm which was concealed
beneath the carpet and this set the alarm ringing in a
near-by store. The continuous ringing of the alarm caused
the occupant of said store to partly open the bank door, and
upon observing the manager standing in the position in
which he had been placed, he called to him and requested
him to turn off the burglar-alarm, as it had been ringing for
quite a while. Not suspecting that a robbery was being
enacted, he departed. Presently a gentleman came into the

bank to write his indorsement upon a check, and, observing no one within, went to the "shelf counter" for that purpose. While he was writing his indorsement upon the check, the defendant, in his attempt to make his escape, holding the satchel with his left hand and the revolver in his right, entered the main business room through one of the cage doors. He proceeded to within five or six feet of the front entrance door, when the police officer, who had been attracted to the bank by the ringing of the burglar-alarm, entered the bank and said, "Hey, fellows, what is going on in here?" In reply to this inquiry the defendant, who was facing the officer, commanded, "Get 'em up." So far as anyone could observe the officer made no motion to draw a weapon. Simultaneously with his command the defendant fired. The first shot knocked the officer's cap from his head and the second entered his abdomen at a point slightly to the right of the median line. The officer, although thus mortally wounded, sprang upon the defendant and prevented him from firing further shots. Immediately the employees and the person who was already in the bank came to the assistance of the officer. A number of people and officers were soon upon the scene. The defendant was overpowered, handcuffed, and delivered into the custody of the officers a short time after the shots had been fired. While thus detained the defendant said to his captors, "I didn't aim to shoot him," and requested that he be not held so tightly. The revolver taken from the defendant contained two exploded shells and four loaded shells. The defendant also carried upon his person sixteen other loaded shells which fitted his Colt's revolver. He also had upon his person fifty-five dollars of his own money.

Defendant's plan was so well timed that he would have been outside the bank and in his parked machine within a few seconds had not the officer entered as above related. The defendant, in planning his escape, had previously parked his Nash automobile in a vacant lot at the corner of Ninth and Mission Streets, replenished with gasoline for flight. It was his intention to abandon the Studebaker car at an opportune time and make his final escape in the Nash car, thus confusing and misleading the officers as to his connection with the crime. While his plan miscarried, it was a well-considered scheme and was calculated to succeed.

Later in the afternoon of the same day the defendant made a statement to the officers which showed that he was fully oriented as to time, place and person and that he attempted to excuse his crime by saying that it was an accident and that he did not intend to shoot the officer. When brought into the presence of the wounded officer the latter pointed him out as the man who had shot him and denounced him as a coward, to which the defendant replied: "I am sorry that I shot you but I had to shoot you in order to get away." In all of his statements the defendant was lucid in expression and showed no mental disturbance. Upon the completion of the first statement made by him, which was taken down in longhand, he was requested to sign it, but declined, stating that he did not know what the officer who had purported to record what he said had written. He said he wanted to see an attorney. He was then requested to read the statement, which he did, and upon finishing it remarked that it was correct but that he wished to make an addition to it. He was told that he was at liberty to make any addition he desired. He thereupon took a pen and added the following: "I accidentally shot, not knowing if I hit him." He then subscribed his name to the statement.

There was nothing shown in the plan or execution of the crime from its inception to its tragic end, nor in the appearance, manner or conduct of the defendant, nor in the disclosures made by him of his connection with the crime, nor in the history of his criminal career, as related by him to the officers of the law, that would tend to establish a case of insanity, considered from the viewpoint of a criminal purpose. His motive, of course, is self-evident. The plan as devised by him and by which he undertook to execute his purpose is conclusive to the point that it was the creation of a deliberate, calculating mind. Within its range there is to be found system and method and the power of co-ordination and the ability to assemble and combine things and events in a congruous manner which could only be done by one who is conscious of the rule of relationism as the average man has learned it by common experience. Further, he unquestionably exhibited a sense of realization as to what he was doing and of the wrongfulness of the criminal act he had planned to commit, and he displayed a keen sense of appreciation as to the dangers attending its execution,

as well as the punitive consequences which would follow apprehension. No one act of his betrayed a symptom of mental disorder which the law recognizes as a defense to the commission of crime. **[1]** In order that "insanity may be availed of as a defense to crime it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed. If he has reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct. **[2]** Although he may be laboring under partial insanity—as, for instance, suffering from some insane delusion or hallucination—still, if he understands the nature and character of his action and its consequences—if he has knowledge that it is wrongful and criminal, and that if he does the act he will do wrong—such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from the responsibility for his criminal acts." (*People* v. *Willard,* 150 Cal. 543 [89 Pac. 124]; see, also, *People* v. *Gilberg,* 197 Cal. 306 [240 Pac. 1000]; *People* v. *Perry et al.,* 195 Cal. 623 [234 Pac. 890]; *People* v. *Williams,* 184 Cal. 590 [194 Pac. 1019]; *People* v. *McCarthy,* 115 Cal. 255 [46 Pac. 1073]; *People* v. *Hubert,* 119 Cal. 216 [63 Am. St. Rep. 72, 51 Pac. 329]; *Marceau* v. *Travelers' Ins. Co.,* 101 Cal. 338 [35 Pac. 856, 36 Pac. 813]; *People* v. *Hoin,* 62 Cal. 120 [45 Am. Rep. 651]; *People* v. *Pico,* 62 Cal. 50; *People* v. *Coffman,* 24 Cal. 230; *People* v. *Hobson,* 17 Cal. 424; 7 Cal. Jur. 862, 863.) In substance the foregoing instruction was given in the instant case. Measured by the test announced in the Willard case, which has been approved by this court in every case in which the question of insanity has arisen since our earliest decisions, there is no room for doubt as to the defendant's responsibility to the law.

The foregoing test, known as the "right and wrong" test, and which was very early adopted as the rule of this state, and is the rule of most of the American courts, is denounced by appellant as being an "antiquated and unscientific" test. It is his contention that the question of insanity is "a question of fact for the jury and not a question of law for the

court." **[3]** Whether the accused was at the time he committed the act for which he is upon trial legally responsible therefor, as responsibility is defined by law, is a question of fact entirely within the province of the jury. The mental test is but a standard by which responsibility is to be measured. It would tend to weaken the safeguards that protect the lives and property of the citizen from the assaults of the vicious and lawless and to aid disorder if it should be established as the law that any mental disorder or disease, however slight, .and regardless of whether it had any perceptible bearing or influence upon the mind of the person moved by malice to commit murder, would afford immunity to crime. The rule that prevails in this state, and, so far as we are advised, in most if not in all civilized nations, was restated, after much discussion and long deliberation, in 1843 by Lord Chief Justice Tindall in response to questions propounded by the house of lords to the judges as to the degree of reason a person should have to be responsible for crime. (16 Cor. Jur., pp. 99, 100, 101, 102.) The rule has the approval of the highest judicial tribunals known to the Anglo-Saxon race, and no reason resting upon experience or known to legal or medical science has been pointed to which would justify the abolition of a test founded upon necessity and approved by experience and which prescribes, with reasonable regard for the frailties and weaknesses of mankind, the degree, kind and quality of mental incompetency or derangement that must be shown to exist to relieve a person of the consequences of his act which otherwise would be punished as a crime.

**[4]** Counsel for defendant attempted to establish his insanity by offering evidence tending to show that a blood taint produced by syphilis had been transmitted to him from his ancestors, and further, that he was a victim of congenital or inherited insanity. The defendant was confined in the state's prison at San Quentin in 1918–19 under a commitment of burglary. The resident physician testified that he examined him physically during that period and diagnosed his case as triple positive syphilis or syphilis in the tertiary stage. He gave no testimony as to the mental condition of the defendant while confined in the prison. There was no indication of an active syphilitic condition existing in the blood-stream at the time defendant was await-

ing trial, considered from either a physical or neurological viewpoint. Such was the admission of one of the physicians who examined him upon the request of his counsel. An examination made shortly before trial of the spinal fluid showed a negative reaction as to the Wasserman test, negative or normal for globulin and negative for the collodial gold test. The cell count, however, was higher than normal. A high cell count of the spinal fluid is produced by any inflammation or irritation in the nervous system and may be caused by syphilis. It indicates some inflammation or irritation of the membrane which covers the brain or spinal cord. Tested by the several standards this was the only test which registered a positive reaction. There was no evidence that the defendant was suffering from active syphilis at the times he was examined by the alienists, nor, as a matter of fact, were there any physical symptoms manifest that would indicate that he ever had the disease, save the cell count test above mentioned.

The family history of the defendant, as related by two members of his father's family, which largely forms the basis of the defense's theory of insanity, was placed before the jury. A judgment pronouncing the defendant's father insane and committing him to the state hospital at Agnews in 1911 was received in evidence. The father was detained in the hospital for a period of but three months and a few days and was then discharged. He was never thereafter returned to the hospital. The superintendent of the institution testified that when the father was admitted to the hospital he was suffering from a psychosis induced by alcoholism, and that he was not afflicted with paresis. Testimony was offered by the defense and received in the case tending to show the abnormal or subnormal mental condition of the mother and sister of defendant's father and also similar mental conditions existing as to certain other collateral relatives. Without analyzing or further commenting upon the evidence as offered it is sufficient to say that the jury gave it such weight and consideration as in its judgment it was entitled to receive. The purpose, plan, acts, conduct and statement of the defendant, considered in orderly sequence, constitute irrefutable proof that the defendant knew and appreciated the nature and the quality of the act he was committing and knew that it was wrong

to commit and that it was punishable under the law. In a statement made by him after the commission of the crime, he admitted that he fully understood the act which he had committed and also knew the law punished its commission. The defendant, doubtless unfortunately circumstanced, had persistently pursued a criminal career since he was twelve years of age. At that early age he was committed to Preston School of Industry, where he spent the larger part of six years. When at liberty it seems that he had no settled place of abode. He confessed to the commission of a number of burglaries, and his mental condition seems not to have been questioned until he was placed upon trial for the crime of murder in the instant case. We feel convinced, as the jury must have been convinced, that the defendant is legally responsible for the commission of the crime of which he stands convicted.

Prejudicial error is claimed to have been committed by the trial court in giving certain instructions tendered by the People and refusing to give certain others proposed by the defendant as to the law of insanity. [5] If the instructions given at the request of the People were sound expositions of the law of insanity the defendant's proposed requests, which announced a converse doctrine, were properly refused. The charge of the court, as to language and substance, was a repetition of the charges that have been approved (except in one instance, to be hereafter discussed) by this court in numerous decisions and the law has become definitely settled as to the soundness of the principles challenged by appellant. To summarize, the attacks consist of objections made to the soundness of the "right and wrong" test which has already received attention, and to the following propositions: The refusal of the law to recognize as a defense the "irresistible, uncontrollable impulse" and moral insanity doctrines; the instruction which admonishes the jury to examine the defense of insanity with care lest an ingenious counterfeit of this mental malady shall furnish immunity to guilt; the burden of proving the existence of insanity by a preponderance of evidence resting upon the defendant. It is not necessary to cite authorities to support these firmly established principles of law. [6] The most serious objection is the one directed against the simulation of insanity as a defense. The instruction given in this case

is in all essentials identical with the instruction approved in *People* v. *Dennis,* 39 Cal. 625; *People* v. *Pico,* 62 Cal. 50; *People* v. *Larrabee,* 115 Cal. 158 [46 Pac. 922]. The principle was also upheld in *People* v. *Bumberger,* 45 Cal. 650. Again, in *People* v. *McCarthy,* 115 Cal. 255 [46 Pac. 1073], the same instruction was given. The court there held that the instruction had received the repeated approval of this court and refused to hold it to be prejudicial error, or an invasion of the constitutional right of the defendant. It did say, however, in admonishing trial courts to follow approved language, that ''it would be better, in most cases, if the instruction were omitted altogether, and, indeed, if its propriety were an open question, we should be much inclined to doubt it.'' It was further said that there might be some danger that the jury might construe such an instruction as expressing an intent on the part of the judge to intimate and characterize his opinion of the case on trial—a result which, in effect, would be a trespass upon the constitutional right of the jury to pass upon facts free from the influence of the judge. In *People* v. *Nihell,* 144 Cal. 200 [77 Pac. 916] in regard to an instruction similar to the one given in the instant case as to the caution that juries should exercise in examining the defense of insanity, it was said that such an instruction had often been considered by this court and while it had been disapproved, yet no case had ever been reversed on account of the giving of it. While it is true that the propriety of cautioning the jury against ingenious counterfeits of mental maladies finds support in the earlier decisions of this court, the propriety of giving such an instruction has been questioned, as above pointed out, by our more recent decisions, and it has been recommended that it would be better not to give it lest the jury should conceive the notion that the court looked upon the defense with disfavor. A jury doubtless would, without being so advised by the court, examine with care the defense of insanity in cases in which the proof of the overt act is so full as to cut off all other means of avoiding conviction, and it is, therefore, unnecessary to quicken its sense of caution by an admonition on the part of the court. The reasons urged against the giving of the instruction do not appear with such pronounced force in the instant case as in some of those cited for the reason that the court carefully and fully admonished the jury to guard

against being influenced by any opinion that any members of the jury might think the court entertained, or had formed, as to any matter of fact or as to any inference deducible from the evidence. In this respect the court gave the additional instruction: "Where insanity is relied upon as a defense, you are not to indulge in any prejudices against such a defense, but should give it thoughtful, thorough and dispassionate consideration." In *People* v. *Methever,* 132 Cal. 326 [64 Pac. 481], an instruction similar to the one under consideration in the instant case was before the court, supported by the same citations that are urged here, and the court there said, "but whether or not the instruction was legally sound or unsound upon its face, it is apparent that no injury resulted to defendant from the giving of it." If it was proper for the court to so state a rule prior to the adoption of section 4½ of article VI of the state constitution, we feel satisfied from an examination of the record in this case that the error complained of, if error it was, resulted in no miscarriage of justice or prejudice to the defendant. We hold that the giving of the instruction in the instant case, while contrary to the recommendations of this court made in the more recent cases, would not justify a reversal of the judgment. Cases may arise in which it would be a more serious question.

[7] In one part of the general charge the court instructed the jury that insanity is a "defense to be weighed fully, fairly and justly, and, when *satisfactorily established* must commend itself to the sense of humanity and justice of the jury," etc. It is argued that to require the defendant to satisfactorily establish insanity is equivalent to telling the jury that the defendant must establish it beyond a reasonable doubt. Certain decisions are cited wherein it was held to be error to instruct the jury that *any* fact "must be *clearly* established by satisfactory proof." To require a fact to be clearly established casts upon the actor a burden greater in degree than would be necessary to establish it by satisfactory proof. No case has been cited which would demand the reversal of a case because of the giving of an instruction so framed. In various parts of its charge the jury was simply told that the defendant was required to establish insanity by a preponderance of the evidence and the burden was upon him to do so. There is no

merit in the above contention. Appellant complains of the
giving of an instruction as to the rule by which the jury should
be guided in judging of the credit to be given to a witness who
has shown himself to be wilfully false in a part of his tes-
timony as affecting his credit with reference to other mat-
ters about which he has testified. The instruction com-
plained of is identical with an instruction discussed by this
court in *People* v. *Sprague,* 53 Cal. 491. The principle of
law involved was considered in *People* v. *Wells,* 145 Cal. 138
[78 Pac. 470], and the instruction is not open to the con-
struction that appellant's argument would seem to place
upon it.

[8] When the defendant appeared for sentence counsel
moved for a stay of all proceedings on the ground that the
defendant was then insane and requested that the court
submit the question of his present insanity to a jury. In
support of the motion his counsel offered all of the evidence
taken at the trial. The motion was denied and counsel
assigned the action of the court in denying the motion as
an abuse of discretion. Obviously the court did not abuse
its discretion. The jury by its verdict impliedly found the
defendant to be sane at the time he committed the murder
and no showing was made that his mental condition had
since changed. The presumption was that he was still sane.
But aside from what we have said with reference to the
question of presumption the court in its refusal to submit
the question of the defendant's insanity to a jury was act-
ing in the exercise of a sound discretion reposed in it by
the provisions of section 1368 of the Penal Code. (*People*
v. *Gilberg, supra.*)

We find no reversible error in the record.

The judgment and order are affirmed.

Lennon, J., Shenk, J., Waste, C. J., Richards, J., Curtis,
J., and Lawlor, J., concurred.

Rehearing denied.