[Crim. No. 4265.  In Bank.—April 15, 1940.]

THE PEOPLE, Respondent, v. VINCENT DAWA, Appellant.

John L. Brannely for Appellant.

Earl Warren, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

CARTER, J.—This appeal from a judgment imposing the extreme penalty comes before us pursuant to the provisions of section 1239 of the Penal Code, which section authorizes an "automatic" appeal in all death penalty cases.  No brief has been filed on behalf of the defendant, though a "memorandum" has been filed by the attorney-general stating the general nature of the case.  An examination of the entire transcript has failed to reveal anything of a prejudicial or reversible character.

It appears that the district attorney of Sacramento County filed an information charging the defendant with the murder of one Lim Ding, a Chinese, on April 19, 1939.  Upon his arraignment the defendant entered the dual plea of not guilty and not guilty by reason of insanity.  The trial on the general

issue was exceedingly brief. The defendant, following an unsuccessful attempt of his counsel to withdraw the ''not guilty'' plea, offered no evidence by way of explanation of or defense to the homicide charge. The evidence of the prosecution showed, in substance, that on the night of the homicide the defendant, a Filipino laborer of the age of 28 years, attended a Chinese social club or gambling establishment in the city of Sacramento, which he had frequented on prior occasions. At one of the tables he lost approximately $1.65, whereupon he left the establishment. He returned within a few minutes and walked to within a few feet of the deceased, who was the dealer or keeper of the table where defendant had lost his money, and fired a shot from an automatic pistol through the head of the deceased. Defendant immediately ran from the place and was taken into custody by the police a short distance away while he held a pursuing crowd at bay with the pistol. He readily admitted the shooting to the arresting officer, giving as his reasons that he did not like the deceased's manner of dealing and that the deceased had laughed at him. The autopsy surgeon testified that the gunshot wound had caused the death of the deceased.

As stated, the defendant offered no evidence upon the general issue, and the jury, under the circumstances, returned a verdict of murder of the first degree without recommendation. The trial upon the defendant's insanity plea then proceeded, as authorized by statute, before the same jury. In view of the ultimate inability of the jury to reach a verdict upon the issue raised by said plea, it was discharged and a new jury sworn to try the sanity issue. At the conclusion of a lengthy trial, wherein evidence making up a transcript of several hundred pages was introduced, the jury returned a verdict finding the defendant sane at the time of the commission of the homicide. Under the verdicts and the law, the trial court had no alternative but to enter judgment imposing the extreme penalty.

The evidence, lay and expert, addressed to the insanity issue, is in sharp conflict and leaves no room for an appellate court to interfere with the finding of the jury thereon. Therefore, it will serve no useful purpose to narrate the evidence in great detail. Suffice it to say that the defendant produced as witnesses his brother, a cousin, a fellow laborer and several inmates of the county jail who occupied the same ''tank''

with him during his confinement awaiting trial. These persons testified as to the defendant's apparent desire not to associate with others because of his expressed belief that they were "against him". They testified that he was given over to mumbling to himself, to publicly practicing self-abuse, to tearing up papers and scattering them about, to pasting magazine pictures on the walls of his cell and talking to them, and to hollering. Each of these lay witnesses expressed the opinion that defendant was insane. All but one of the county jail associates of the defendant were impeached on cross-examination by reason of prior felony convictions. Under the circumstances, the jury apparently attached but little weight to their testimony concluding, unquestionably, that their sole desire was to assist a fellow prisoner. The relationship to and friendship for the defendant of the other lay witnesses was undoubtedly considered by the jury in its resolving of the conflicts in the evidence. Defendant also produced two medical experts who testified that they had examined him while in jail and found that he was suffering from paranoia, i. e., from delusions of persecution. In answer to a hypothetical question propounded by defense counsel each expert gave it as his opinion that the defendant could not distinguish between right and wrong—the accepted test of sanity in criminal cases in this state. (*People* v. *Walter*, 7 Cal. (2d) 438, 440 [60 Pac. (2d) 990].) However, one of said experts in response to a hypothetical question propounded on cross-examination, and containing many of the facts surrounding the commission of the homicide, readily answered that the enumerated circumstances "would certainly be evidence of sanity".

As against this showing of the defendant, the prosecution produced as a witness the deputy sheriff who had charge of the county jail and who over a period of months had opportunity to observe the defendant. He testified that he had never seen anything unusual in the defendant's conduct and that none of his fellow inmates ever had complained of the defendant's actions. Without narrating his testimony, another witness, who had been employed by the district attorney to "serve" a term in the county jail in order to observe the defendant, contradicted much of the testimony of the other inmates. The prosecution called as witnesses three medical experts, two of whom had been appointed by

the trial court to examine the defendant. The first expert, Dr. Wilder, an expert in diagnosing and treating mental diseases and who had served on the staff of the Napa State Hospital and since 1905 had been an examiner in insanity in Sacramento County, testified that he examined the defendant pursuant to appointment by the court and was of the opinion that the defendant did know the difference between right and wrong. In the course of his testimony, the witness stated that the defendant had told him he smoked marijuana and knew that it was wrong and that the government put users thereof in the ''big house''—showing on the part of the defendant an appreciation of the difference between right and wrong.

Another expert, a psychiatrist, who had been employed by the district attorney to examine the defendant, testified that during his examination the defendant stated he had shot the deceased ''because he tried to cheat him''. The witness related that the defendant gave no evidence of having any delusions or hallucinations. It was the opinion of the doctor that the defendant knew the difference between right and wrong.

Finally, the prosecution called Dr. Smythe, superintendent of the Stockton State Hospital, who likewise had been appointed by the court to examine the defendant. The witness testified that defendant said he nearly always lost at the gambling house where deceased worked and was shot, and that the defendant appeared to be resentful toward the deceased because he (the defendant) had been called ''a cheap gambler'' and told ''not to come back any more''. As a result of this, the defendant told the witness that ''he was angry, very angry''. To this witness the defendant likewise mentioned his use of marijuana and his knowledge of the fact that users of the drug were put in ''this here jail''. The doctor expressed the opinion that the defendant ''belongs to that class of people who have a constitutional anti-social understanding, and that he did know the difference between right and wrong''.

The foregoing adequately discloses that there is in the record ample evidence of a substantial nature to support the verdict of the jury that the defendant was sane at the time of the commission of the homicide. In view of such verdict and the prior verdict on the general issue finding

the defendant guilty of murder of the first degree without recommendation, the trial court, as already stated, had no alternative but to enter judgment imposing the extreme penalty. We have found nothing in the rulings of that court or in its instructions, which were full and fair, that in any way tended to prejudice the defendant. Under the circumstances, we can do nothing but affirm the judgment.

The judgment and order denying a new trial are, and each is, affirmed.

Shenk, J., Edmonds, J., Houser, J., Curtis, J., and Waste, C. J., concurred.