THE STATE OF NEVADA, Plaintiff, Respondent, v. FERDINAND BOURDLAIS, Also Known as VERNON BOURDLAIS, Defendant, Appellant.

No. 3743

January 15, 1954.                    265 P.2d 761.

*Jack J. Pursel,* of Las Vegas, for Appellant.

*William T. Mathews,* Attorney General; *George P. Annand, John W. Barrett,* and *Wm. N. Dunseath,* Deputy Attorneys General, of Carson City. *Roger D. Foley,* District Attorney; *George M. Dickerson,* Deputy District Attorney, of Clark County, Las Vegas, for Respondent.

## OPINION

By the Court, EATHER, C. J.:

The defendant is the appellant, and the plaintiff is the respondent in this court. The parties will be referred to herein as plaintiff and defendant as in the lower court.

Ferdinand Bourdlais, also known as Vernon Bourdlais, was tried, convicted, and sentenced to death upon a charge of murdering Ward Budzien, Sr., on or about May 21, 1952, and he has appealed, contending that his trial was not fair nor in accordance with law.

As to who committed the homicide or how or why it was committed, there is no conflict. There may be variance in the details of the story but if so they come from the defendant's and not the state's evidence. There were many disputes and controversies in the course of the trial involving questions of procedure and law, but the all-important question, and the only real one on the merits of the case, was whether defendant at the time he took Budzien's life, was mentally deficient. Defendant contends that he had been imbibing intoxicating liquor; that the coupling of his mentally retarded personality with the effects of intoxicating liquor produced a mental condition under which he did not at the time realize the nature or the consequences of his act and that it was wrong.

The state insists that the killing of Ward Budzien, Sr., by the defendant at the time and place alleged in the information, was committed in the perpetration of robbery, and was, therefore, murder in the first degree.

That we may have the picture before us in the consideration of defendant's complaints we here give a condensed synopsis of the salient features of the evidence.

On the evening of May 19, 1952, Ferdinand A. Bourdlais, also known as Vernon Bourdlais, the defendant, was in Los Angeles, California, where he met Harry Dyer in a bar. The two determined to travel east together and stayed in a hotel that evening. While in the hotel room the defendant displayed a 38-caliber revolver and expressed his intention of robbing people as the occasion demanded in order to finance the trip across the country. In this Dyer acquiesced and the bullets were packed in Dyer's suitcase as were the bare necessities for the trip. The rest of the luggage of the pair was checked at a Railway Express Office in Los

Angeles, and after both had breakfast in Los Angeles they started hitchhiking eastward on U. S. Highway No. 66.

At about the same time in the morning as the defendant and Dyer left Los Angeles, two other groups of young men left Los Angeles for points east. One group included Joseph Juszczak, age 23, Arnold Cole, age 22, and Boleslaus Melski, age 18, all of Buffalo, New York, who had unsuccessfully sought work in the Los Angeles area and were traveling to Detroit. The other group consisted of James Cockrell, age 17 and Daryl Andrews, age 17, two recent graduates of Sarcoxie, Missouri, high school, who had journeyed to Los Angeles for summer employment to finance their continued studies in a small Missouri college. They, because of their age, had also been unsuccessful in securing employment and were returning home.

On May 20, 1952, the deceased, Ward Budzien, Sr., age 47, a Los Angeles salesman, driving a 1949 Buick 4-door sedan, picked up the two Missouri boys a few miles beyond San Bernardino, California, city limits, and 10 miles further down the highway, the three Buffalo, New York, boys were picked up. The group proceeded on, with three occupying the front seat and three the back seat. The deceased (Ward Budzien, Sr.) observed the defendant (Bourdlais) and Dyer standing beside the highway at the intersection of U. S. Highway 191 and 91 and told the occupants to make room so that they could also secure a ride, as he had hitchhiked himself when he was young. The deceased had been drinking to the extent that he was intoxicated before he picked up the hitchhikers. His driving became so erratic that he was asked by Daryl Andrews to let him drive. The deceased (Budzien) took a rear seat, Daryl Andrews took the driver's seat and the group continued on. The deceased offered all occupants a drink, but no one other than the defendant took the bottle. They stopped in Barstow, California, for gasoline and the deceased sent defendant after another pint of whiskey. When the

defendant returned with the whiskey he noticed a roll of bills in the shirt pocket of the deceased and according to his own testimony: "When I bought this whiskey for that man, this Mr. Budzien, and returned the money to his shirt pocket, I noticed a roll of bills there and I figured I would rob him of his money."

The group continued on to Baker, California, where they stopped to eat. While entering a roadside cafe, the defendant said to his companion Dyer, "I've got something cooked up." Dyer said, "So lay off the whiskey." Defendant responded, "I'm not drinking, I'm only pretending. I stick my tongue in the bottle to stop the liquor from going down my throat," and while in the cafe defendant reiterated to Daryl Andrews that he was not drinking but sticking his tongue in the bottle. All of the parties had something to eat and although the defendant only remembers having had coffee, Andrews testified that the defendant ate and he believed he had a sandwich. After the meal was paid for out of funds supplied by the deceased (Budzien), and cigarettes purchased, the parties resumed their places in the vehicle. In the front seat, Andrews was driving with Cockrell next to him, Dyer next and Juszczak beside the right front door. In the back seat the deceased sat next to the left door, the defendant beside him, Cole beside the defendant and Boleslaus Melski next to the right rear door. Although defendant testified he drank throughout the trip, Melski and Cole testified that no one in the car had anything to drink after eating at Baker, California, as did Dyer, who had been afraid defendant might get drunk and he would have him on his hands in Las Vegas, but who lost concern over defendant becoming intoxicated as they traveled along. Budzien had fallen asleep and the occupants in the back seat were discussing the problem of hitchhikers with drivers of vehicles who would stop and as the hitchhiker approached to get in they would pull away. The defendant said, "If anyone did that to me I'd fill him full of holes—I've got the thing to do it with." He then removed

from his belt the 38-caliber revolver. It never left his hands for the remainder of the trip, although defendant and his friend Dyer contended that Cole handled it at one point. Defendant was asked to put it away and he stated he was going to rob the deceased (Budzien). He feigned illness and asked Andrews to stop the vehicle. He awakened Budzien and asked him to get out, but was told by Budzien and Cockrell to get out by the other door. He closed the door, struck Cockrell on the arm and the group continued on for a distance of 30 miles when, with the revolver in his hand, the defendant leaned over the back of the front seat and asked if the boys wanted in on robbing Budzien, or as the defendant testified, "I did ask the other boys if they wanted in on the robbery or in on taking the money." The two youngest, Cockrell and Andrews said they did not and asked to be let out of the vehicle in Las Vegas. Proceeding on into Las Vegas, Nevada, and after passing through the outskirts of the city, Andrews and Cockrell were permitted to leave, but admonished by the defendant not to say anything to the police. As Juszczak helped them remove their luggage from the trunk of the vehicle he asked them to remain as the five of them could get the gun away from the defendant, who remained in the vehicle beside Budzien. The Missouri boys, however, were too frightened and went immediately to a drive-in and reported the incident to the police. The others proceeded on with Juszczak driving, Dyer beside him and Melski beside the right front door. Budzien still sleeping, occupied the left rear seat, defendant next to him and Cole by the right rear door. At a point beyond Henderson, Clark County, Nevada, Juszczak was directed by the defendant to pull off the main highway onto a dirt road. They proceeded up the road until the defendant directed Juszczak to stop the vehicle. The defendant struck Budzien over the head with the butt of his gun three times. Budzien awakened and asked why he was being hit. Defendant told Budzien that he was going to rob him and take his car. The defendant

removed money from the pockets of Budzien while the two were still in the vehicle and then ordered Budzien out the left rear door. Outside of the vehicle the defendant proceeded to remove the money from the shirt pocket of Budzien, and Juszczak and Cole, in an endeavor to save the man who had befriended them, left the vehicle. Cole went around the back of the vehicle and approached Budzien as Juszczak approached Budzien from the other side. In view of both Juszczak and Cole, defendant raised the revolver to the right temple of the deceased and pulled the trigger. Cole and Juszczak froze in their tracks.

Defendant testified, "The only thing I can remember real well is when the gun went off. I remember pulling the trigger. I don't know why I shot the man; I realized what I had done when the gun went off, because I had the gun in my hand." When the body of the deceased slumped to the ground the defendant, looking at the prostrate form at his feet, made the statement: "He's deader than a mackerel." He ordered the boys to dig a grave and he removed a tire iron from the trunk of the vehicle, at the same time asking Dyer to get cartridges out of the suitcase so that he would not have an empty chamber in the revolver. He loosened the dirt with the tire iron while the other boys dug with their hands and then the defendant pulled the body of the deceased from the point where it had fallen to the shallow grave. Before burying the body the defendant said that he would blow the face off the deceased so that he could not be recognized and further that he would destroy the laundry markings in the clothing and burn the clothing. The boys were able to talk the defendant out of this and the body was covered. The defendant expressed his intention of returning to dig the grave deeper so that the vultures would not be attracted to that spot and the attention of by-passers called to the location of the body. They returned to the vehicle where the defendant searched the glove compartment for any other valuables the deceased may have had. They then

drove to the main highway, proceeding back towards Las Vegas, Nevada, and stopped along the way to obtain gasoline for the vehicle. They next went to the Igloo in Pittman, Nevada, to secure a room and the defendant went in to register. Not knowing the license number of the vehicle he asked that one of the others accompany him and his friend Harry Dyer was called to the manager's office to register with the defendant. Juszczak, Cole and Melski remained in the vehicle and as the defendant, Dyer, and the manager of the motel went into a room, Juszczak turned the vehicle around and sped out into the highway, proceeding on into Las Vegas, Nevada, as fast as the vehicle would travel. Dyer testified that while he was in the motel with the defendant after the three Buffalo boys had left, the defendant became enraged because the car had been taken and stated that he killed the man for nothing; because he wanted the car and now the car was gone, it was all for nothing; if he had known the boys were going to do this he would have killed them too.

At an intersection in Las Vegas, Nevada, Juszczak observed a Las Vegas department police car. He spun the vehicle around, stopped in the middle of the street and the three New York boys ran over to the policeman to report what they had witnessed. The policeman quieted them down, radioed the sheriff's office that he had made contact with the boys, placing them in his vehicle and returned to the intersection by the drive-in where the two boys from Missouri were waiting with other officers. All proceeded back to the motel where the three Buffalo, New York, boys had last seen the defendant and Harry Dyer. They searched the motel, but were unable to find either of them. One of the sheriff's vehicles proceeded down the highway with the five boys and walking in the opposite lane of traffic were the defendant and Harry Dyer. They were ordered over to the vehicle with their hands up and the murder weapon was removed from the belt of the defendant. Defendant and Dyer were taken in another vehicle to

the point where the dirt road leading to the grave connected with the main highway. Defendant navigated under his own power up the dirt road and needed no assistance, and in the opinion of the arresting officers was not in any condition that indicated he was under the influence of alcohol. At the grave site, the defendant and Dyer removed the earth from the body of the deceased and the defendant was taken into custody.

After being booked, defendant said: "He's dead, I killed him, and that is that. I don't want to say any more."

Defendant was examined in the office of the Clark County district attorney on May 22, 1952, by Dr. G. W. Shannon, assistant superintendent of Patton State Hospital, a branch of the State of California Department of Mental Hygiene. Based upon that examination, Dr. Shannon concluded that defendant was sane; that he is a psychopathic personality; that he had normal mental development, intellectual development, and was able to tell the difference between right and wrong.

The evidence produced on behalf of defendant is substantially as follows:

He was born in 1927 in Marinette, Wisconsin, of a large and impoverished family. The family resided in a building which had been used as a city poor house and was in need of repair and which lacked the minimum conveniences of running water, electricity, and inside toilet facilities. In 1942 the family of defendant was reported to have been on the relief rolls since 1925; the defendant's father was crippled, unemployed except for odd or part-time jobs as a cook or bartender, and was an alcoholic. Defendant's mother was mentally retarded and illiterate. An older brother, Francis, was committed to an institution for the feeble-minded for a period of more than four years.

Defendant's childhood was one of severe privation. At the age of 11 he stole a bicycle, was apprehended, pleaded guilty, and was placed on probation. In June 1941, at the age of 14 he was committed to the State

Industrial School after pleading guilty to a charge of car theft. From June 1941, until July 26, 1951, except for brief intervals, defendant was institutionalized in the industrial school, the Wisconsin Reformatory, or Wisconsin State Prison, for stealing, violation of parole, or attempted escape.

During this period of time defendant was on three occasions (November 6, 1941, August 14, 1946, February 13, 1947) subjected to mental examinations by Peter Bell, M.D., examiner for the Psychiatric Field Service of the Wisconsin State Department of Public Welfare. During this period of time defendant was twice placed in the Mendota Hospital in Wisconsin, an institution which provides treatment and care for persons with mental illness, for the purpose of medical diagnosis and treatment and mental observation and treatment. He was transferred to said hospital on February 7, 1942, after a suicide attempt, and remained there until March 18, 1942, when he was returned to the industrial school. Defendant was later returned to the said hospital for further observation (the record shows that defendant was there on August 14, 1942), and was subsequently returned to the Wisconsin School for Boys.

As a result of the examinations and observations aforesaid (the first of which took place when defendant was 14 years of age and the last when he was 19), the examiner, Dr. Bell, reported that defendant had a low normal mentality. At age 14 his mental age was determined to be 13½. At age 19 on two separate occasions he showed a mental age of 13 years, 6 months. He repeated the sixth grade at the age of 14. Dr. Bell further reported that defendant's reasoning powers were impaired and that his judgment was defective. Dr. Bell's report further showed defendant to be unstable, preoccupied, inhibited, sensitive, devoid of good self-confidence, immature, obsessed of conflicts of personal nature, self-conscious, rather morbid and depressed, blocked in his thought associations, rather schizophrenically colored in his reaction, and evaluated defendant as

having a neurotic character defect. Dr. Bell's prognosis as to defendant's future was that it was poor and that defendant's future was dark.

Although defendant, at the time of Dr. Bell's examination, was found to be unable to evidence proper self-control, he was found to be able to distinguish between right and wrong.

We refer to the foregoing only for the purpose of calling attention to the substance of the evidence respecting defendant's childhood and family background and with his institutional history which we deem necessary to a full understanding of some of the questions raised on this appeal.

With reference to his drinking on the night of the shooting, defendant's testimony was somewhat at variance with that of other witnesses. He testified that after he and Dyer had been picked up by Budzien, "I seen him tip the bottle up and take a drink and he offered it around and asked everybody if they wanted a drink. Nobody accepted. I took the bottle and had a pretty good drink." When Budzien moved to the back seat he "took a couple of more drinks, handed the bottle over to me and I took a couple of more drinks and I handed it back to him. He set it on the floor by his feet and then dozed off. * * * Whenever I wanted a drink I didn't want to wake him up, so I would reach over and take a drink and put the cap on and put it back." After securing the other bottle, "He took a drink and I took a drink and he put it back on the floor. No one else in the car was drinking, just myself and Mr. Budzien. I think we drank most of the liquor which was in that bottle." Other than this, defendant gave no testimony as to the extent of liquor consumed by him. He did not testify that he became intoxicated.

Harry Dyer testified in part as follows:

"Q. Now as you moved along down the highway, is it true that you lost your concern over Vernon becoming intoxicated? A. Yes. * * *

"Q. Was his speech coherent? A. Yes, sir.

"Q. Did he speak plainly? A. Yes.

"Q. Were his eyes clear? A. I am not sure of the condition of his eyes."

Lloyd Bell, deputy sheriff of Clark County, testified in part as follows:

"Q. Now, officer Bell, while you were walking with the defendant did you have an opportunity to observe whether he was steady on his feet? A. Yes, sir.

"Q. How did he walk? A. He walked straight up the road without help.

"Q. Was he standing erect? A. Yes.

"Q. Did you have an opportunity to observe whether there was a smell or odor of alcohol on his breath? A. There was not.

"Q. Did you have an opportunity to observe whether or not his eyes were bloodshot at that time? A. I didn't get too good an opportunity to notice.

"Q. Did you have an opportunity to observe whether or not his speech was slurred or thick? A. It didn't appear to me to be so.

"Q. Did he speak coherently? A. Yes, sir."

Seven errors are assigned.

Defendant's first assignment makes the point that the court erred in giving Instruction No. 30. Instruction No. 30 reads as follows:

"It is a well settled rule of law that drunkenness is no excuse for the commission of a crime. Drunkenness forms no defense whatever to the fact of guilt, for, when a crime is committed by a party while in a fit of intoxication, the law will not allow him to avail himself of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. Evidence of drunkenness can only be considered by the jury for the purpose of determining the degree of the crime, or for the purpose of determining whether the defendant was sane or insane at the time the alleged offense was committed."

Defendant contends that Instruction No. 30 does not

fully and correctly state the law with reference to drunkenness as a defense to the crime of murder because it failed to advise the jury that they might consider intoxication in determining the existence of a specific mental condition essential to the commission of a particular kind or degree of offense.

Section 9966, N.C.L.1929, provides:

"INTOXICATION, WHEN IT MAY BE CONSIDERED IN MITIGATION OF OFFENSE. Sec. 17. No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such purpose, motive or intent."

It will be noted from reading Sec. 9966 that it does not require that drinking by the defendant must be considered by the jury in the determination of a particular intent necessary to constitute a particular crime. The statute states the fact of intoxication of a person may be considered.

In reading the entire record in this case we find that while there is some evidence of drinking on the part of the defendant, there is not a particle of evidence contained therein to show that the defendant was intoxicated at the time of the commission of the crime. Upon this point the only evidence is to the effect that he was not intoxicated.

In the course of the trial not once did defendant claim his mental condition was confused to the extent that he had no intention of killing. The transcript of testimony fails to show any claim of intoxication or drunkenness on the part of the defendant. He testified he drank while he was in the vehicle of the deceased, but he did

not assign this as a reason for his haziness about facts until the revolver held in his hand was discharged and he then realized what he had done. In this respect compare his testimony with that of every other witness, including the testimony of Harry Dyer, the defendant's witness. Because defendant made it appear as if he were drinking from the bottle, Dyer testified that he was concerned about having defendant upon his hands in Las Vegas if he became drunk, but as the group proceeded on towards Las Vegas, Dyer testified he lost all concern over defendant becoming intoxicated. Compare also his testimony with that of Juszczak and Andrews, who both testified to the defendant's saying that he was not drinking, but was placing his tongue in the bottle to prevent consuming any liquor. Compare this testimony with that of Deputy Sheriff Lloyd Bell, who testified that the defendant gave no appearance of having been under the influence of intoxicating liquor and no alcohol was smelled on his person.

Defendant has referred to and cited the case of State v. Johnny, 29 Nev. 203, 87 P. 3; State v. Jukich, 49 Nev. 217, 242 P. 590. In the case of State v. Johnny, supra, there was ample evidence of intoxication offered. Witnesses testified that both defendants were drunk and boisterous the whole day and evening before the offense; that they were so drunk that they needed the assistance of each other to get along. In the case of State v. Jukich, supra, the testimony was not as conclusive as in the Johnny case. However, the court gave instructions patterned on those given in the Johnny case. This does not mean, however, that it would have been improper not to so instruct if the evidence of the case did not warrant such instruction. The instructions in each case, of course, must be determined on the evidence adduced. As pointed out, section 9966 does not require that evidence of drinking be considered in determining a particular intent. In this regard, attention is called to State of Nevada v. O'Connor, 11 Nev. 416, at page 424. The court had this to say:

"The second and third instructions refused were to the effect that if the defendant, at the time of the assault, was so drunk as to be incapable of forming or entertaining an intent to kill, he could not be convicted as charged. It is a sufficient reason for sustaining the refusal of the court to give these instructions, that there is not a particle of evidence contained in the record going to show that the defendant was intoxicated at the time of the assault. It is true that the court, at the request of the defendant, gave other instructions to the effect that if the defendant was found, on account of intoxication or other cause, not to have entertained an intent to kill, he could not be convicted of the crime charged. This does prove that there must have been *some* evidence of intoxication, but it does not prove that there was any evidence of such a degree of intoxication as would have rendered the defendant incapable of entertaining or forming an intent to kill."

See also the case of State v. Heinz, 223 Iowa 1241, 275 N.W. 10, at page 19, reported in 114 A.L.R. 959, at 973. In the above case the court held "that partial drunkenness does not make impossible the formation of a criminal intent and the evidence was insufficient to prove defendant was so intoxicated that he was unable to form a criminal intent." In the above case the same contention was relied upon by appellant in that case; that the instruction was not complete and it did not advise the jury they might consider intoxication of defendant as reflecting on ability to manifest the required intent to kill. The instruction in that case makes no reference to the consideration of the mental condition of appellant, whereas Instruction No. 30 in the case at bar specifically provides that the jury can so consider evidence of intoxication and whether the defendant was sane or insane at the time the alleged offense was committed. The appellant in the Heinz case testified, "I was not awful drunk, but as far as myself I would consider I was pretty drunk," and as pointed out, no such testimony was elicited from the defendant in the case at bar, as such was

not the fact. In the Heinz case, the court held that partial drunkenness does not make impossible the formation of a criminal intent and the evidence was insufficient to prove defendant was so intoxicated that he was unable to form criminal intent. It was the court's ruling that no error could be predicated on the instruction given.

Therefore, under the facts of the case, in our opinion, the giving of Instruction No. 30 by the trial court did not constitute prejudicial error.

Defendant next contends that the trial court erred in refusing to give defendant's proposed Instruction C. Proposed Instruction C reads as follows:

"If you find from a preponderance that the defendant, at the moment of the killing, by reason of intoxication or insanity was incapable of forming in his mind and had not formed in his mind any intention to commit either robbery or murder, then you must find the defendant not guilty."

The trial court refused the foregoing instruction proposed by defendant on the ground that it does not correctly state the law as to intoxication.

Defendant contends that said instruction properly states the law and cites 23 C.J.S., page 757, and the numerous citations thereunder, in support of his proposition.

From a careful examination of the cases cited by defendant in support of his proposition, the crimes with which the defendants were charged did not involve crimes in which a lesser included offense required no intent. It will be noted in the case at bar that Instruction No. 8 given at the request of defendant and instructions on all lesser included offenses of the crime of murder were given to the jury. Included among these instructions was Instruction No. 24 on involuntary manslaughter, which specifically provides that an unintentional killing of a human being in the commission of an unlawful act or of a lawful act which might probably produce such a consequence in an unlawful manner, is

involuntary manslaughter. Under the instructions proposed by counsel for the defendant the jury would have been precluded from returning a verdict of guilty of involuntary manslaughter.

As stated in 23 C.J.S., section 1334, page 993, "It is proper to refuse a request for an instruction which does not correctly state the law." See also: State v. Sheeley, 63 Nev. 88, 97, 162 P.2d 96; State v. Skaug, 63 Nev. 59, 68, 161 P.2d 708, 163 P.2d 130; State v. Burns, 27 Nev. 289, 294, 74 P. 983.

The court did not err in refusing to give the above proposed instruction.

Defendant next contends that the court erred in giving Instruction No. 25. Instruction No. 25 reads as follows:

"The defendant is presumed to be sane until proven insane. In determining whether the defense of insanity has been made out, you must decide whether the evidence for or against it outweighs. If the evidence tending to show insanity outweighs that against it, then it is proven. If not proven, it is out of the case; if proven, it takes its place along with other received proof; and if, upon the whole evidence, as thus settled, there is any reasonable doubt of guilt, either in existence or degree, the defendant must be given the benefit of such doubt, either to acquit or reduce the grade of crime."

The defendant contends that Instruction No. 25 given by the court relative to insanity in the instant case was prejudicial error for the reason that the instruction does not state the law. In support of this argument, appellant relies upon 23 C.J.S., section 1200, page 754. The authorities cited thereunder do not correctly state the law of this jurisdiction.

In the case of State v. Behiter, 55 Nev. 236, 29 P.2d 1000, the court distinctly charged that insanity is not proved or established by simply raising doubt as to whether it exists or not. Such has been the law of this jurisdiction since the opinion in State v. Lewis, reported

in 20 Nev. 333, 22 P. 241, in which the court goes to great length in discussion of the problems of insanity as a defense to crime.

In the case of People v. Perez (Cal.), 263 P.2d 29, at page 31, the court stated:

"Defendant was presumed to be sane and it was incumbent upon him to show that at the time of the commission of the homicide he was not able to distinguish right from wrong or know the nature and consequences of his acts."

See also State v. Nelson, 36 Nev. 403, at page 413, 136 P. 377, wherein the court said it saw no good reason for changing the rule enunciated in the Lewis case relative to the propositions of law on the subject of insanity. See also State v. Fouquette, 67 Nev. 505, 221 P.2d 404. The supreme court of this state as far back as 1889 has approved an instruction in the form in which Instruction No. 25 was submitted to the jury in the case at bar. Therefore, under the facts of this case, we find no error in the giving of Instruction No. 25. The instruction does correctly state the law applicable to the instant case.

Defendant next contends that the court erred in giving Instructions Nos. 26 and 27, for the reason that they are repetitious and place undue emphasis on the burden upon the defendant of proving his insanity. In support of this proposition, defendant cites 16 C.J. 1036, note 59 and several other citations. 23 C.J.S., Criminal Law, sec. 1304.

The instructions both deal with the same subject matter; the burden and necessary extent of proof of insanity. Clearly they are repetitious, and failure to combine them into a single instruction appears to be wholly unjustified. However, this in itself can hardly be said to constitute prejudicial error. We do not regard the instructions as giving undue prominence to the principles involved. Under the circumstances of the case it was deemed necessary for many instructions to be given

upon the subjects of insanity and intoxication and overlapping to a certain extent was almost unavoidable and hardly likely to become conspicuous in any one instance.

In the case of State v. Jukich, 49 Nev. 217, at page 239, 242 P. 590, the court said:

"In the case of State v. Johnny, 29 Nev. 203, 87 P. 3, practically the same instructions were given and approved by this court, in which the jury was twice told that evidence of drunkenness should be received with great caution."

In our view, then, the giving of Instructions Nos. 26 and 27 did not result in a miscarriage of justice or prejudice the rights of the defendant in the instant case. In this regard the case of State v. Skaug, 63 Nev. 59, at page 74, 161 P.2d 708, 163 P.2d 130, the court held:

"The statute (sec. 11266 N.C.L.) places the burden on the appellant to show an error of the kind authorizing this court to set aside the judgment. As we said in State v. Williams, 47 Nev. 279–285, 220 P. 555, 557: 'From a reading of this statute it must not only appear that the trial court erred, but it must appear affirmatively that the error resulted in a miscarriage of justice, or actually prejudiced the defendant. In other words, we can indulge in no presumption favorable to the defendant. Such is the clear, unequivocal, unambiguous provision of the statute.' State v. Willberg, 45 Nev. 183, 200 P. 475, and State v. Ramage, 51 Nev. 82, 269 P. 489, are to the same effect."

Defendant next contends that the court erred in permitting the State's expert witness to testify as to the sanity of the defendant at the time of the act with which he is charged, and as to whether or not he was at that time able to distinguish between right and wrong, over objections of defendant's counsel.

As his sole authority in support of this proposition, the defendant relies upon the case of People v. Jacobs (Cal.), reported in 51 P.2d 128.

In the case of People v. Woods (Cal.), reported in 65 P.2d 940, 942, the court has this to say:

"Finally, the defendant contends that by permitting the two alienists to give over his objections their opinions concerning the defendant's ability to determine between right and wrong, the trial court committed prejudicial error. In this behalf, the defendant relies almost wholly upon People v. Jacobs, Cal. App., 51 P. 2d 128. Unfortunately for the defendant, but fortunately for the people of California, the opinion in that case is resting in a judicial morgue, having succumbed to a painless lethal gas in the form of an inoffensive order by the Supreme Court transferring the case to a higher sphere. The opinion did not get further than the advance sheets and does not appear in the permanent volumes of the Reports. It is not the law in California."

The court, at page 942, points out the various tests for determining mental capacity in will contests, commitment to mental institutions, an insane person standing trial and criminal insanity, and had this to say:

"If the expert is limited to giving his opinion that the person is insane the jury will never know what test the expert took into consideration as his basic test of insanity. In a criminal case, if the expert cannot be asked his opinion as to whether the accused knew right from wrong, the jury is left absolutely in the dark as to whether or not the expert is applying in his mind the correct test of insanity."

The court further stated, at page 943:

"It is no more an invasion of the province of the jury for an expert to give his opinion that an accused is insane, including the correct legal test, than for him to give his opinion merely that the accused is insane, and none of the cases hold that it is an invasion of the province of the jury for the expert to give his opinion that the witness is insane. It cannot fairly be argued that any prejudice is caused the accused by allowing the jury to know the basis upon which the expert has reached his conclusions and the grounds therefor. On the one hand,

if the jury does not believe the expert's opinion that the accused is insane merely, it will disregard the opinion. On the other hand, if the jury does not believe the expert's opinion that the accused knew the difference between right and wrong, it will likewise disregard the opinion; for the jurors are instructed that the question is for them to decide and that they are not bound to accept the opinion of any expert as conclusive, and that they may disregard any such opinion if it shall be found by them to be unreasonable.

"For citations that tend to support our conclusion, see 11 Ruling Case Law, 584; People v. Keaton, 211 Cal. 722, 296 P. 609; People v. Willard, 150 Cal. 543, 89 P. 124; People v. Sloper, 198 Cal. 238, 244 P. 362."

A cautionary instruction was given to the jury in the instant case. Instruction No. 32 instructed the jury as follows:

"While you are not bound by the testimony of expert witnesses, still, in considering such testimony, the professional standing of such witnesses must be taken into consideration in arriving at a verdict; and you should consider the character, the capacity, the skill, the opportunities for observation and the state of mind of the expert. The opinions of experts are to be considered by you in connection with all other evidence in the case. You are not to act upon them to the exclusion of other testimony. You are to apply the same rules to testimony of experts that are applicable to other witnesses in determining its weight."

In Instruction No. 34 the court instructed the jury it was their province to award to the statements of the various witnesses the credence and weight to which in their judgment they might be entitled, and in Instruction No. 2 the jury were advised that it was the exclusive province of the jury to decide and determine questions of fact. It will be seen, therefore, that the instructions as given by the court properly charged the jury as to the consideration to be given to the testimony of the expert witness without placing undue weight

thereon. See Wharton's Criminal Evidence, 11th Edition, section 993, at page 1738, wherein it is pointed out as follows:

"Such opinions are admissible because they are scientific deductions from the facts to enable the jury to decide the questions of fact intelligently, and they are received because the nature of the facts is such that they cannot be correctly understood by the jury unless the expert gives his opinion as to what such facts do or do not indicate."

The decision in People v. Woods, supra, was cited with approval in Burgunder v. State (Arizona), 103 P. 2d 256, and in People v. Dawa (Cal.), 101 P.2d 498, the court held the accepted test of insanity in criminal cases is whether defendant could distinguish between right and wrong, and experts were permitted to testify to such fact.

In the instant case there was no evidence showing, or tending to show, that the defendant was insane at the time he killed Budzien. That he knew the nature of his act is evidenced by the fact that he planned it and executed it as planned, and hastened from it as quickly as he could. He knew he would be punished if apprehended because he knew what he was doing constituted not only robbery but murder in its perpetration.

The court did not err in permitting the State's expert witness to express an opinion as to the ability of the defendant to distinguish between right and wrong.

For his sixth assignment defendant contends that the trial court erred in giving Instruction No. 32, in that it consisted of judicial comment, and placed undue weight upon the testimony of the expert witness. The instruction when read in its entirety clearly states that the jury is to apply the same rules to the testimony of experts as are applicable to other witnesses in determining the weight to be accorded. The instruction had equal application to the testimony of Dr. Peter Bell, witness for the

defendant, whose deposition was admitted without objection by the State. The instruction was given in the case of State v. Watts, 52 Nev. 453, 290 P. 732, which is cited as authority therefor. The instruction is not erroneous. The court could properly instruct as to the testimony of expert witnesses so as to inform the jury that they should not disregard such testimony merely because given by experts.

As to his seventh and final proposition, the defendant contends that the verdict of the jury is contrary to the evidence in this case. No authority, however, is cited in support thereof.

It has been the rule in the State of Nevada, long established and consistently adhered to by this court, that if there is substantial evidence to support the verdict of the jury, the evidence will not be weighed by this court, nor the verdict or judgment disturbed. This court cannot reverse the judgment upon the ground of insufficiency of the evidence where there is substantial evidence to support the verdict of the jury. State v. Wong Fun, 22 Nev. 336, 40 P. 95; State v. Boyle, 49 Nev. 386, 248 P. 48; State v. Teeter, 65 Nev. 584, 200 P.2d 657; State v. McKay, 63 Nev. 118, 165 P.2d 389, 167 P.2d 476; State v. Fitch, 65 Nev. 668, 200 P.2d 991.

We are aware of the seriousness of our responsibility in a case where a man's life is involved. To the degree we are capable, we have carefully scrutinized all matters of substance claimed as error by the defendant. We are also conscious of the fact that a trial in the courts of this state is a proceeding in the interest of justice to determine the guilt or innocence of the accused and not a mere contest to determine the abler adversary. We will not reverse criminal causes for mere error or irregularity. It is only where there has been error which is both substantial and prejudicial to the rights of the accused that a reversal is warranted. The defendant

was entitled to a full and fair presentation of the case to a jury of unbiased citizens and to have his rights safeguarded by competent counsel. This has been done. We believe the defendant has been accorded the full measure of protection afforded him under the constitution and the laws of our state.

We have examined the entire case and in our opinion no other verdict could be reasonably accounted for under the evidence. The fact is, the evidence overwhelmingly supports the verdict.

The judgment and the order denying a new trial are hereby affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison of the judgment rendered.

MERRILL and BADT, JJ., concur.

ON PETITION FOR REHEARING

March 19, 1954.

*Per curiam:*

**Rehearing denied.**